PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

v.                                              No. 02-4209

JAMAR DAMIAN QUARLES,
                    *Defendant-Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(CR-01-0273)

Argued: February 26, 2003

Decided: May 27, 2003

Before WIDENER, KING, and SHEDD, Circuit Judges.

Affirmed by published opinion. Judge Widener wrote the opinion, in which Judge King joined. Judge Shedd wrote a concurring opinion.

## COUNSEL

**ARGUED:** Denise Charlotte Barrett, Assistant Federal Public Defender, Baltimore, Maryland, for Appellant. Paul M. Tiao, Assistant United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, Baltimore, Maryland, for Appellant. Thomas M. DiBiagio, United States Attorney, Baltimore, Maryland, for Appellee.

## OPINION

WIDENER, Circuit Judge:

This case is an appeal from a jury verdict in which the defendant was found guilty of two counts of possession of a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g). The defendant was sentenced to 144 months imprisonment and 3 years of supervised release.[1] The firearm possession charge in count one occurred on September 17, 1999, and the validity of that search and whether the defendant possessed the firearm is not at issue in this appeal. The charge in count two referred to an incident that occurred on May 7, 2001. The recovery of the firearm on that day gave rise to certain statements alleged to have been made by the defendant after he was stopped which were subsequently introduced against him at trial.

Prior to trial, the defendant made a motion to suppress the statements on the ground that the encounter that he had with the police on May 7, 2001 was an illegal *Terry* stop giving rise to fruit of the poisonous tree. The district court denied the motion, finding that "there was more than reasonable suspicion to execute this stop," there was "no evidence to indicate that the statement was anything other than a volunteered blurt," and thus, there was nothing unconstitutional in the police behavior. At the conclusion of the government's case-in-chief and again at the conclusion of all the evidence, the defendant moved for judgment of acquittal as to count two. The district court denied both motions. On October 10, 2001, the jury found the defendant guilty as to counts one and two. He was sentenced on March 12, 2002 and has appealed.

On appeal,[2] the defendant asserts that the report of the 911 caller

---

[1]The defendant was convicted on both counts charged in the indictment. He was sentenced to 120 months on count one and 24 months, consecutive, on count two. There was also a special assessment issued against him in the amount of $200.00, but the court determined that the defendant did not have the ability to pay the fine and it was waived.

[2]With respect to both counts, the defendant also alleges on appeal that (1) 18 U.S.C. § 922(g) is an unconstitutional exercise of the commerce

was insufficient to provide the police with reasonable suspicion to stop the defendant, investigate his activity, and thereby obtain incriminating statements that were admitted against him at trial. We affirm the judgment of the district court.

On May 14, 2001, a grand jury issued an indictment against the defendant on two counts of illegal possession of a firearm in violation of 18 U.S.C. § 922(g). The first count alleged that the defendant was in possession of a .38 caliber revolver on September 17, 1999, and the second count alleged that the defendant was in possession of a 12 gauge shotgun on May 7, 2001. The incident related to the first count is not at issue in this appeal.

The events surrounding the arrest on May 7, 2001 are as follows: On May 7, 2001, a 911 operator in Prince George's County, Maryland, received a call reporting that the defendant was walking towards Nash Street on Chapel Wood Lane. In addition, the caller explained that the U. S. Attorney's Office was looking for the defendant. The caller provided a description of the defendant, stating that he was black, with long dreadlocks, and that he had on a bluish green jersey with the number 90 on it. The caller also stated that the defendant was with two other men and that they were carrying a bag. Later in the phone call, the caller specified that it was the defendant who was carrying the bag and that the defendant had a gun in the bag. When the dispatcher asked the caller what the defendant was wanted for, the caller responded that he was wanted for carrying a gun, and that the defendant had killed the caller's brother, but the defendant had "beat

---

power, (2) proof that a firearm traveled at some point in its life in interstate commerce is not sufficient to show that the firearm was possessed "in or affecting commerce" under Section 922(g), and (3) the district court erred in refusing to instruct the jury that it must find that the firearm's possession had to affect commerce in a non-trivial way. The defendant concedes that this court has ruled that Section 922(g) is a valid exercise of Congress's authority under the Commerce Clause. See *United States v. Nathan*, 202 F.3d 230, 234 (4th Cir.), *cert. denied*, 529 U.S. 1123 (2000); *United States v. Gallimore*, 247 F.3d 134 (4th Cir. 2001). The defendant raises these issues to preserve them for en banc and certiorari review. Based on the law of this circuit, we hold to be without merit those last three issues under our holdings in *Nathan* and *Gallimore*.

the case." The caller also said that Pervis Smith, a U. S. Marshal, had a warrant out for the defendant and that Special Agent Smith had told the caller that he should call Agent Smith if the caller saw the defendant, or should call the police if the caller could not get a hold of Agent Smith. In response to the 911 call, Officer Donald Taylor received a dispatch order to respond to the area in question. Indeed the 911 caller kept the defendant in sight and was talking to the 911 operator until the caller saw the officers put the defendant on the ground. So there was no chance of mistaken identity.

While Officer Taylor was sent to the scene, the dispatcher kept the caller on the line. Throughout this 14 minute conversation, the caller, who had the men in sight, was keeping the dispatcher apprised of where the defendant was walking with the men and continued to update the descriptions of the men and identify them. He identified the defendant and another man, Mark Waters, accurately, but was mistaken about the identity of the third man. Towards the end of the 911 call, the caller identified himself as a Mr. Rainey and agreed to have the dispatcher send some police officers to the corner of Nash and Eastern, where Rainey was sitting in his vehicle, so that the officers could speak to Rainey directly.[3]

Meanwhile, before the end of the call, Officer Taylor had arrived on the corner that the caller had described and encountered four suspects. The officer had been informed by the dispatcher that the U. S. State's Attorney was looking for the defendant and was provided with the description given by Rainey. Upon seeing the defendant, who matched the description, Officer Taylor pulled his car up beside the defendant and approached him and the other men. Officer Taylor engaged in small talk with the men and confirmed the identity of the

---

[3]When the officers had not arrived at Rainey's car within eight minutes, Rainey called 911 again to confirm that officers were in fact coming to speak with him. Officers later did meet Rainey and spoke with him regarding the incident. We do not depend, however, on any conversations that Rainey had with any officers or 911 operators after the 14 minute phone call. The reason is that we do not rely on any fact that occurred after the defendant's arrest because the exact time sequence of such events is not clear from the record.

defendant and then proceeded to run a check to see if he had an open warrant.[4]

Officer Taylor testified that the defendant was not carrying a bag when he was originally stopped. Because the telephone description had been very accurate, however, Officer Taylor began looking around for a bag and noticed a dark bag lying beside a bush exactly where the defendant and the other men had been standing when the officer had pulled around the corner. Another officer on the scene retrieved the bag and found a sawed-off 12 gauge shotgun inside. Officer Taylor testified, "after we found the gun by the bush, [the defendant] stated that we didn't get the gun on him and he would beat that." The officer said that the statement was made without any provocation and was not in response to a question about the gun. After a few more minutes, Officer Taylor received confirmation that the defendant had an outstanding federal warrant against him and then arrested the defendant.

Prior to trial, the defendant filed a motion to suppress the evidence gathered as a result of the stop conducted on May 7, 2001. The district court denied the motion, finding that the stop was an appropriate one. The court found that the purpose of a stop is "to check who is this and is there an open warrant, and that's really all they did [here]." Furthermore, the court found that the bag was retrieved before the end of the stop and that it was still appropriate for the police to be investigating whether there was an open warrant.

The issue of whether the police had reasonable suspicion necessary to sustain a stop and frisk of the defendant is to be reviewed *de novo*. See *Ornelas v. United States*, 517 U.S. 690, 699 (1996). This court should review findings of historical fact only for clear error and give due weight to inferences drawn from those facts by resident judges

---

[4]Officer Taylor testified that he asked the men if they had seen a pit bull chasing a little girl because the police had gotten a report to that effect. He said that this was to divert their attention. The four suspects, although walking away initially, eventually stopped to talk to the officer. At that time, he patted them down for weapons, due to the information given on the dispatch that the men were armed.

and law enforcement. See *Ornelas*, 517 at 699; *United States v. Sprinkle*, 106 F.3d 613, 616-17 (4th Cir. 1997).

The defendant argues on appeal that the police lacked reasonable suspicion to apprehend him, thus the stop was unconstitutional. An investigative stop, referred to as a *Terry* stop, is constitutional when it is supported "by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Sprinkle*, 106 F.3d at 617 (citing *Reid v. Georgia*, 448 U.S. 438, 440 (1980) (per curiam)). The scope of a *Terry* stop, which is considered an exception to the probable cause requirement, was first established in the 1968 case of *Terry v. Ohio*. *Terry v. Ohio*, 392 U.S. 1 (1968). In *Terry*, the Supreme Court noted that the law enforcement official making the stop does not need to be certain that criminal activity is on-going, but needs only to "be able to point to specific and articulable facts which, taken together with rational inference from those facts, reasonably warrant intrusion." *Terry*, 392 U.S. at 21-22. In defining the reasonable suspicion standard, the Court stated, "The Fourth Amendment requires 'some minimal level of objective justification' for making the stop. That level of suspicion is considerably less than proof of wrongdoing by a preponderance of evidence." *Alabama v. White*, 496 U.S. 325, 329-30 (1990) (citation omitted). Furthermore, the Court stated that "reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *White*, 496 U.S. at 330.

The *Terry* stop has been developed over the years and the Court held in *United States v. Hensley* that law enforcement officials may conduct a *Terry* stop based upon reasonable suspicion "that a person they encounter was involved in or is wanted in connection with a completed felony." *United States v. Hensley*, 469 U.S. 221, 229 (1985). In *Hensley*, an informant provided the police with information that the defendant had participated in a recent robbery. *Hensley*, 469 U.S. at 223. Based on this information, the police issued a wanted flyer to other police departments. Twelve days after the reported robbery, Hensley was stopped by officers in another precinct based on the information in the flyer.

Upholding the constitutionality of the stop, the Supreme Court stated that its precedents do not suggest that police are precluded "from stopping persons they suspect of past criminal activity unless

they have probable cause for arrest." *Hensley*, 469 U.S. at 227 (citing *United States v. Cortez*, 449 U.S. 411, 417 n.2 (1981); *United States v. Place*, 462 U.S. 496, 702 (1983); *Michigan v. Summers*, 452 U.S. 692, 699 & n.7 (1981)). Rather, it stated,

> [W]here police have been unable to locate a person suspected of involvement in a past crime, the ability to briefly stop that person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice.

*Hensley*, 469 U.S. at 229. While the Court did not make a finding that *Terry* stops are permitted to investigate all past crimes, it did find that "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *Hensley*, 469 U.S. at 229.

In the instant case, the district court relied on two primary cases in rendering its opinion. First, distinguishing this case from *Florida v. J.L.*, 529 U.S. 266 (2000), the court found that there was sufficient reasonable suspicion in this case for the police to make the stop. The court stated that, unlike in *J.L.*, the caller here gave enough information to be identified later, and therefore, was not totally anonymous at any time. In addition, the court noted that the tip in this case was "much, much more reliable, had a wealth of detail, indicated personal knowledge by the caller of a person named Jamar Quarles with that description, and I think justified a stop."

Second, the district court concluded that the stop did not exceed the scope of the Fourth Amendment. Relying on *Hensley*, the court determined that the stop was permissible because it was made with reasonable suspicion that the defendant was wanted in connection with a completed felony. The court noted, "The stop here was for the purpose of finding out i[f] this Jamar Quarles, is there an open warrant from the Federal Government for him, and, by the way, if you stop him, you better check for weapons." Thus, the court found that the stop was appropriate and refused to suppress any statements the defendant had made. We will analyze the district court's determinations in turn.

The first question in this case is whether the police had reasonable suspicion, based on specific and articulable facts, that the defendant was involved in or connected with a completed felony. See *Hensley*, 469 U.S. at 229. Thus, we must ask if the 911 caller was sufficiently reliable to justify the stop. The defendant argues that because Rainey did not reveal his name until the end of the conversation, the tip was essentially anonymous, and thus more akin to *Florida v. J.L.*, 529 U.S. 266 (2000).[5] We disagree.

The *J.L.* case involved a brief and anonymous tip, which the Supreme Court found to be lacking sufficient indicia of reliability to justify the stop because the call "provided no predictive information" and the officers had no reasonable basis for suspecting J.L. of unlawful conduct. *J.L.*, 529 U.S. at 271. The district court in this case stated, "This is a very far cry from the tip in *Florida v. J.L.*, which was brief, totally anonymous and indicated no basis upon which to be able to identify the talker." We agree with the district court and find that *J.L.* does not control this case.

First, we do not believe that 911 call in this case qualifies as anonymous. Regardless of when the caller gave his name, the caller did identify himself to the dispatcher, and indeed, went a step further and arranged for the police to meet with him after the phone call to verify the information. Rainey stayed on the 911 line for 14 minutes, watching the defendant and providing the dispatcher with on-going information regarding the defendant and even witnessing the police approaching the defendant. In addition to giving the defendant's name to the police, Rainey stated that the defendant had killed his [Rainey's] brother and "beat the case." We believe there was sufficient

---

[5]In *J.L.*, the police received an anonymous tip that there was a young, black male standing at a particular bus stop, wearing a plaid shirt, and carrying a gun. *J.L.*, 529 U.S. at 268. The tipster was unidentified and there was no known recording of the tip. *J.L.*, 529 U.S. at 268. Additionally, the police had no information regarding illegal conduct. Police officers approached three men at the bus stop in question (including the defendant who was wearing a plaid shirt), who appeared to be "hanging out". *J.L.*, 529 U.S. at 268. They found a gun on the defendant and arrested him for, *inter alia*, illegal possession of a firearm. *J.L.*, 529 U.S. at 268-269.

information given to accurately identify the caller. The fact that Rainey was identifiable lends support to his credibility and reliability because, the Supreme Court has noted that "a known informant['s] reputation can be assessed and [she] can be held responsible if her allegations turn out to be fabricated." *J.L.*, 529 U.S. at 270 (citations omitted).

Second, we believe that the caller in this instance provided enough information to "test [his] knowledge or credibility." *J.L.*, 529 U.S. at 271. In *J.L.*, the Court noted that the only thing that the police had to go on was an "unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information." *J.L.*, 529 U.S. at 271. On the contrary, here Rainey provided the police with inside information and explained his connection to the defendant. For example, in addition to a detailed description of the defendant (including his name, the color of jersey he was wearing with the number that was on the jersey, his hairstyle, and his exact location), Rainey knew that there was a warrant out for the defendant's arrest, the type of offense that the defendant was wanted for (involving possession of a firearm), the fact that he was carrying a bag with a gun, and the name of the U. S. Marshal involved in the case.

We are also guided here by our decision in *United States v. Christmas*, 222 F.3d 141 (4th Cir. 2000), *cert. denied*, 531 U.S. 1098 (2001). In *Christmas*, officers conducted a *Terry* stop after a neighborhood resident approached one of the officers, who was investigating another crime in the area, informing the officer that the officer needed to "deal with the drugs and the guns" at a house a short distance away.[6] *Christmas*, 222 F.3d at 143. We found the informant was sufficiently reliable for two reasons: the officer's face-to-face encounter with the woman gave the officer an opportunity to assess her credibility and demeanor; and she could be held accountable for her false

---

[6]The woman who approached the officers did not provide her name, but she did provide her address, 309 Canal Street, and the address of the house of which she was speaking, 401 Canal Street. *Christmas*, 222 F.3d at 143. The woman was intoxicated and did not follow the police officers to the house in question when they responded to her information. *Christmas*, 222 F.3d at 143.

statements because she approached the police officer. *Christmas*, 222 F.3d at 144.

The defendant argues that this case is distinguishable on the basis that Rainey was not technically face-to-face with an officer when providing his information and contends that Rainey did not provide sufficient personal information to be held accountable. We find that neither of these assertions distinguish these two cases. While Rainey was not face-to-face with an officer, he was on the phone with the dispatcher for 14 minutes watching the defendant and providing to the 911 operator detailed and precise information about the defendant. The amount of information that Rainey was able to provide to the dispatcher enabled the dispatcher to make a determination about his credibility.

Additionally, Rainey provided sufficient information to the police that he could have been held accountable for his statements. Not only did Rainey provide his name, he provided information about the murder of his brother, the name of a U. S. Marshal to whom he had spoken about Quarles, the color and make of his own car, and his location. This was enough information for the police to track down Rainey and enough that Rainey is bound to have felt as though he was being held accountable for what he was saying. Our decision in *Christmas* is informative here and we are of opinion that the caller in this instance carried as much, if not more, credibility than the tipster in *Christmas*. *Christmas*, 222 F.3d at 144-45.

Having established that the 911 caller was a reliable informant, we move to the second inquiry, which is whether the stop exceeded the scope of the Fourth Amendment. As construed in *Hensley*, a *Terry* stop is permissible when it concerns a person involved in a prior crime if the police had reasonable suspicion, grounded in specific, articulable facts. *Hensley*, 469 U.S. at 229. We have already determined that Rainey was a reliable informant; the 911 call was not anonymous and provided sufficient information about Rainey and about the defendant to find Rainey credible and knowledgeable. We also believe that the 911 call provided sufficient reasonable suspicion to justify stopping the defendant. Indeed, the *Hensley* Court found sufficient reasonable suspicion for a stop with no more, or even less, to go on than we have here.

At the time the police stopped Quarles, they knew from the 911 call that there was a federal arrest warrant outstanding for Quarles which involved the possession of a gun. The officer in charge stopped Quarles and detained him until the officer could verify there was a warrant outstanding. At that time, Quarles was arrested.

The question raised on appeal which we here consider is only the admission into evidence of the various conversations Quarles had with the officers from the time he was stopped until he was arrested.

We are of opinion this case is controlled by *Hensley* and our opinion in *Christmas*, rather than by *J.L.*. The stop in this case was a lawful *Terry* stop. The conversations were properly admitted into evidence.

The judgment of the district court is accordingly

*AFFIRMED*.

SHEDD, Circuit Judge, concurring:

By the time that the police detained Quarles, the 911 caller — who remained on the telephone line and kept Quarles within his sight — had indirectly identified himself to police by stating that Quarles had killed his brother and beaten the case; and he had told the police that Quarles had an outstanding federal warrant against him for illegal firearm possession, that a federal agent named Pervis Smith was looking for Quarles, and that this federal agent had told him to call the police if he saw Quarles. The 911 caller had also told police that Quarles was then in the company of another individual who was also the subject of an outstanding warrant and that Quarles (and/or his companions) was carrying a gun and drugs. Additionally, the 911 caller had provided the police with a specific description of Quarles and the specific location where they could find him.

Although it is a close call, I believe that under the *Terry* standard, the information set forth above (particularly about the warrant and the federal agent), construed in the light most favorable to the government, *see United States v. Seidman*, 156 F.3d 542, 547 (4th Cir.

1998), gave the police more than an "inchoate and unparticularized suspicion or 'hunch,'" that Quarles was wanted or otherwise was involved in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 27 (1968). Accordingly, I concur in the result reached by the majority concerning the *Terry* stop.[1]

I write separately to note that at the time of the *Terry* stop, it does not appear that the 911 caller had yet provided the police with his name, his exact location, or a description of his automobile; and he had not yet indicated any willingness to meet with them.[2] Because it appears that the 911 caller only gave that information to police after the *Terry* stop, it should not be considered in the reasonable suspicion analysis. *See Florida v. J.L.*, 529 U.S. 266, 271 (2000) ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search").[3]

---

[1] I agree with the majority that the scope of the *Terry* stop was reasonable and that Quarles' Commerce Clause arguments lack merit.

[2] At the suppression hearing, the government introduced into evidence the "CAD report," which the district court described as being "sort of a shorthand, typed-in rendition of what is being sent out" by the dispatch. J.A. 75. Quarles introduced the 911 call audiotape. Matching the CAD report with the transcript of the audiotape provides a time frame of events.

[3] *See also Leverette v. Bell*, 247 F.3d 160, 168 n.5 (4th Cir.), *cert. denied*, 534 U.S. 993 (2001) ("the reliability of a tip must . . . be viewed at the time the search becomes necessary"); *United States v. Ienco*, 182 F.3d 517, 524 (7th Cir. 1999) ("reasonable suspicion must exist at the time the officer stops an individual, . . . it cannot come after the fact").