PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.                                              No. 05-5223

JAMES EDWARD ELSTON, JR.,
            *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Glen E. Conrad, District Judge.
(CR-05-8)

Argued: November 29, 2006

Decided: March 13, 2007

Before WILLIAMS and KING, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Judge King wrote the opinion, in
which Judge Williams and Senior Judge Hamilton joined.

## COUNSEL

**ARGUED:** Paul Graham Beers, GLENN, FELDMANN, DARBY &
GOODLATTE, Roanoke, Virginia, for Appellant. Jean Barrett Hud-
son, Assistant United States Attorney, OFFICE OF THE UNITED
STATES ATTORNEY, Charlottesville, Virginia, for Appellee. **ON
BRIEF:** John L. Brownlee, United States Attorney, Roanoke, Vir-
ginia, for Appellee.

**OPINION**

KING, Circuit Judge:

James Edward Elston, Jr., appeals from the district court's denial of his motion to suppress evidence of a handgun found in his vehicle by police officers in Roanoke, Virginia. *See United States v. Elston*, No. 7:05-cr-00008 (W.D. Va. April 18, 2005) (memorandum opinion denying defendant's motion to suppress) (the "Opinion").[1] Elston was convicted, in the Western District of Virginia, of possession of a firearm by a convicted felon (in violation of 18 U.S.C. § 922(g)), on a conditional plea of guilty. He reserved his right of appeal on the suppression issue, and contends that the handgun on which his § 922 conviction rests was the fruit of an unlawful search and seizure. As explained below, we reject this contention and affirm.

I.

A.

In the early morning hours of January 15, 2005, a Roanoke 911 operator received a report of a drunk driver from a woman identifying herself as Melba Taylor. Taylor asked the operator not to disclose her name to the police, because she was afraid that Elston, who was the subject of her call, would learn that she had reported him; the operator honored Taylor's request, and did not provide her name to the officers who responded to the 911 call. Taylor advised the operator that a highly intoxicated driver was leaving her home in Roanoke's Lansdowne housing project, "driving crazy" and headed towards either a nearby Family Dollar store or his own home in an area known as Wellmont Farms. J.A. 111. She reported that the driver's name was Jimmy, and that he had recently been released from a jail sentence imposed for assaulting the mother of his child. Taylor described the drunk driver as a black male wearing a light blue sweater, jeans, and white tennis shoes, and described his vehicle as a dark blue, 2003-model pickup truck with black-tinted windows, a large silver toolbox

---

[1]The Opinion of the district court is found at J.A. 132-39. (Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

in back, and handicapped plates bearing license number 270464. She further advised that the driver had in his truck a loaded 9mm handgun, along with three clips of ammunition, and that he had threatened to "let[ ] them off in somebody." J.A. 109.

Immediately after Taylor's call, another 911 operator radioed police officers in the area, advising them of Taylor's report that a subject was outside the Lansdowne project with a loaded 9mm handgun and several clips, and that he had brandished the weapon. This second operator relayed to the officers Taylor's description of the subject and his vehicle. Meanwhile, the operator who had taken Taylor's call broadcast additional information over a computerized text-display system available in Roanoke police patrol cars. This information included Taylor's assertion that the subject had threatened to "let[ ] the gun off." J.A. 104.

Within minutes of the 911 dispatch, Officer Jason Hicks of the Roanoke Police located a truck matching the description provided by Taylor, parked in a lot adjacent to the Lansdowne project. Officer Hicks observed that the truck's driver, later identified as defendant Elston, was a black male wearing a blue shirt. With his service weapon drawn, Hicks ordered Elston out of the truck and handcuffed him. During this process, Hicks smelled a strong odor of alcohol on Elston.

As Officer Hicks was detaining Elston, Officer Travis Reed, who had also responded to the 911 dispatch, examined the truck. Officer Reed has given conflicting statements regarding the circumstances of this examination. In a written report filed shortly after the incident, on January 20, 2005, he said that he had first opened the truck door and then observed a handgun grip protruding from between the driver's seat and the center console. On April 14, 2005, however, at Elston's suppression hearing in the district court, Reed testified that his written report was incorrect, and that Elston actually had left the truck door open when he exited the vehicle, leaving the handgun grip visible to an observer standing outside the vehicle.

After Officer Reed discovered the handgun inside Elston's truck, Officer Hicks contacted a police dispatcher and learned that Elston was a convicted felon. Elston was then informed that he was under

arrest, and was taken to jail. On January 27, 2005, Elston, who had three previous convictions for felony offenses, was charged with a violation of 18 U.S.C. § 922(g), which prohibits a convicted felon from possessing a firearm.

On April 1, 2005, Elston filed a motion to suppress evidence of the handgun found in his truck, maintaining that the officers had contravened his Fourth Amendment rights both in detaining him and in searching his vehicle. The district court conducted a hearing on Elston's suppression motion on April 14, 2005, and, four days later, on April 18, 2005, issued its Opinion denying the motion. In so ruling, the court concluded that Taylor's 911 call had the same legal status as an anonymous tip, because her identity, although known to the 911 operator, had not been relayed to the officers. *See* Opinion 4-5. Nonetheless, the court decided that the officers' initial stop of Elston was reasonable, because it was based on information that bore substantial indicia of reliability and indicated that Elston posed a serious danger to the public. *See* Opinion 5-6. The court also determined that the officers' initial detention of Elston was only a *Terry* stop, rather than a full arrest, and that the officers had not conducted an unlawful search of Elston's truck. *See* Opinion 7-8.

On July 29, 2005, Elston entered a conditional guilty plea, contingent on the outcome of his appeal of the district court's ruling on his suppression motion. *See* Fed. R. Crim. P. 11(a)(2) (authorizing conditional guilty pleas). On October 28, 2005, the court sentenced Elston to twenty-seven months' imprisonment. Elston has timely appealed the denial of his motion to suppress, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

### B.

In an appeal of a district court's ruling on a motion to suppress evidence, we review the court's legal conclusions de novo and its underlying factual findings for clear error. *See United States v. Rusher*, 966 F.2d 868, 873 (4th Cir. 1992).

### II.

Elston contends that the Roanoke officers violated his Fourth Amendment rights both in detaining him and in searching his truck.

He asserts that the 9mm handgun found in the truck was the fruit of these unlawful acts by the officers, and that the district court thus erred in denying his motion to suppress evidence of the firearm. In its Opinion, the court concluded that the officers' initial detention of Elston was a temporary, investigatory stop of the kind authorized by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968), and that Taylor's 911 call had given the officers a sufficient basis to conduct such a *Terry* stop. Elston challenges both aspects of that ruling. First, he maintains that, at the time they detained him, the officers did not possess information sufficient to warrant a *Terry* stop. *See* Opinion 5-7. Second, Elston asserts that his initial detention was actually a full arrest rather than a temporary detention under *Terry*, and that even if the officers could have lawfully carried out a *Terry* stop, they lacked probable cause to arrest him. Elston's third appellate contention is that Officer Reed conducted a warrantless search of his truck that was not justified by any of the recognized exceptions to the Constitution's warrant requirement. As we will explain, none of Elston's contentions withstands scrutiny.

A.

Elston first asserts that the district court erred in concluding that the officers possessed a sufficient basis to subject him to a *Terry* stop. His contention in this regard depends on the proposition, accepted by the district court, that Taylor's 911 call was anonymous because only the 911 operator, and not the officers, knew Taylor's identity at the time of the detention and search. Proceeding from that premise, Elston relies on the precedent of *Florida v. J.L.*, 529 U.S. 266 (2000), and *United States v. Brown*, 401 F.3d 588 (4th Cir. 2005) — each of which examined a report from an anonymous informant and deemed it insufficient to justify a *Terry* stop — for his view that the district court erroneously decided that the stop conducted here was reasonable.

*J.L.* involved an anonymous tip "that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." 529 U.S. at 268. The Supreme Court ruled that this "bare-boned," anonymous tip, standing alone, was insufficient to justify a *Terry* stop. *Id.* at 273-74. The Court also rejected Florida's assertion that the tip did not need to satisfy the usual standards of reliability merely

because it alleged that its subject was carrying a firearm. *Id.* at 272-73. In declining to adopt the so-called "firearm exception" that Florida advocated, however, the Court observed that a report of an emergency situation, such as a person carrying a bomb, might justify a *Terry* stop even if it did not satisfy the standards of reliability that would apply in less urgent circumstances. *Id.* at 273-74.

Our 2005 decision in *Brown* applied the principles of *J.L.* to an anonymous report that "a short, black male with glasses was carrying a firearm outside the Roseman Court apartment complex" in Newport News, Virginia. 401 F.3d at 590. We concluded that so spare a tip, coming from an anonymous informant, lacked the indicia of reliability necessary to justify a *Terry* stop. *See id.* at 596.

The Government maintains that the district court erred in treating Taylor's 911 call as anonymous, and that *J.L.* and *Brown* are therefore inapposite. We can decide this appeal without reaching that question, however, because the information that the 911 operators provided to the officers in the field supplied a sufficient basis for a *Terry* stop of Elston — even if we assume, for purposes of our analysis, that Taylor was an anonymous informant.[2] It is well established that anonymous information can furnish grounds for a reasonable search or seizure if it exhibits sufficient indicia of reliability. *See J.L.*, 529 U.S. at 270; *United States v. Perkins*, 363 F.3d 317, 323 (4th Cir. 2004). Our decisions provide guidance on the factors that can indicate the reliability of anonymous information. We have recognized, for example, that an anonymous call is more likely to be reliable if it provides substantial detail about the individuals and the alleged criminal activity it

---

[2]The district court's conclusion that Taylor was an anonymous caller because only the 911 operator knew her name is in tension with our decision in *United States v. Quarles*, 330 F.3d 650 (4th Cir. 2003), where we expressly relied on the 911 operator's knowledge of a caller's identifying details in ruling that the call was a valid basis for a *Terry* stop. *See id.* at 655. *Quarles* did not squarely address, however, the issue of whether a 911 call is anonymous when only the 911 operator knows the caller's identity, and so we treat that question as undecided in this Circuit. We need not reach it today, because the information from Taylor's call that was relayed to the officers in the field was sufficient to support their *Terry* stop of Elston.

describes; if it discloses the basis of the informant's knowledge; and, especially, if the informant indicates that her report is based on her contemporaneous personal observation of the call's subject. *See United States v. Quarles*, 330 F.3d 650, 655 (4th Cir. 2003) (giving weight to informant's "detailed description of the defendant"); *Perkins*, 363 F.3d at 324 (distinguishing *J.L.* on ground that caller in *Perkins* had "revealed her general location and her basis of knowledge, as the nature and substance of her tip made clear that she was in close proximity to the men and that she was observing them while she was on the phone"). Another — and even more significant — indicator that an anonymous informant is reliable is her disclosure of information that would enable authorities to identify her if they deem it necessary to do so. *See Quarles*, 330 F.3d at 656 (concluding that call's reliability was enhanced because informant provided "enough information for the police to track [him] down," and "enough that [he] is bound to have felt as though he was being held accountable for what he was saying").

In sharp contrast to the "bare-boned" tips considered in *J.L.* and *Brown*, Taylor's 911 report, as communicated to the officers who detained Elston and searched his truck, possessed all of these important indicia of reliability. Taylor provided a wealth of detail about Elston's appearance, vehicle, weapon, behavior, and state of mind. She volunteered that Elston had just departed the Lansdowne housing project after uttering a threat to shoot someone, indicating that the basis of her report was her contemporaneous personal observation of Elston's conduct. And, perhaps most important, by indicating that Elston had left her presence only moments before she dialed 911, Taylor enabled the authorities to identify her simply by finding out who Elston had been with immediately before he was detained. As the district court properly recognized, these facts place Taylor's 911 report in a category far removed from the brief, general tips at issue in *J.L.* and *Brown*.

Of additional significance is the fact that Taylor was reporting an imminent threat to public safety — an individual who had expressly threatened to shoot someone in the very near future. No such emergency was presented in either *J.L.* or *Brown*. Indeed, in *J.L.*, the Supreme Court went out of its way to distinguish the hypothetical situation in which an anonymous caller reports an urgent danger to the

community, acknowledging that such compelling circumstances could render reasonable a detention that might otherwise be impermissible. *See J.L.*, 529 U.S. at 273-74. The imminent threat faced by these officers carries substantial weight in assessing the reasonableness of their actions, and further distinguishes this matter from the precedents on which Elston seeks to rely.

In sum, Taylor's 911 report, even if anonymous, bore strong indicia of reliability and alerted the police officers to a serious and imminent danger. Given such circumstances, the district court did not err in concluding that the officers possessed information sufficient to justify a *Terry* stop of Elston.

### B.

Elston next contends that the district court erroneously classified his initial detention by the police as a *Terry* stop rather than as a full arrest. He maintains that the court therefore erred in assessing the detention's lawfulness under the reasonable suspicion standard that governs temporary stops under *Terry*, instead of the probable cause test that applies to arrests. Elston offers two reasons for his assertion in this regard. First, he points to Officer Hicks's suppression hearing testimony that, at the time Hicks initially detained Elston, Hicks "effectively . . . consider[ed] him under arrest," even though Hicks did not formally arrest Elston until after learning that he was a felon in possession of a firearm. J.A. 65. Second, Elston maintains that no reasonable person in the circumstances of his initial detention would have believed himself free to leave, and that the detention was thus an arrest rather than a *Terry* stop.

Both aspects of Elston's position on this point misapprehend the controlling legal principles. First, the subjective views of a police officer who effects a detention have no bearing on whether that detention constitutes an arrest. Rather, an arrest is defined using an objective standard: whether "the suspect's freedom of action is curtailed to a degree associated with formal arrest." *Park v. Shiflett*, 250 F.3d 843, 850 (4th Cir. 2001) (internal quotation marks omitted); *cf. Stansbury v. California*, 511 U.S. 318, 323 (1994) (observing that "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the

interrogating officers or the person being questioned"). Accordingly, Elston's initial detention was not an arrest merely because Hicks regarded him as "effectively . . . under arrest" at that time. J.A. 65.

Similarly immaterial is Elston's assertion that no reasonable person would have felt free to leave in the circumstances of his initial detention. We have expressly recognized that "the perception that one is not free to leave is insufficient to convert a *Terry* stop into an arrest. A brief but complete restriction of liberty is valid under *Terry*." *United States v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir. 1995) (internal alteration marks omitted). Additionally, we have observed that "*Terry* stops differ from custodial interrogation in that they must last no longer than necessary to verify or dispel the officer's suspicion," not because of "the absence of any restriction of liberty." *Id.* Elson does not maintain that his detention lasted longer than was necessary to verify the officers' suspicions that he had a handgun; indeed, the officers located Elston's weapon almost immediately after detaining him. That he was not free to leave during the officers' brief period of investigation does not transform his detention into an arrest.

Importantly, the techniques that the officers used to effect Elston's detention were consistent with an investigatory stop under *Terry*. Our decisions have recognized that "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest." *Leshuk*, 65 F.3d at 1109-10. These officers reasonably suspected that Elston was armed and dangerous, and thus did not exceed the limits of a *Terry* stop by drawing their weapons and placing Elston in handcuffs. In these circumstances, the district court committed no error in concluding that Elston's initial detention by the officers did not rise to the level of a custodial arrest.

## C.

Finally, Elston maintains that Officer Reed unlawfully searched his truck, and that the district court thus erred in refusing to suppress the 9mm handgun that was seized from the truck in Reed's search. The court reached its contrary conclusion by characterizing Reed's investigation of the truck as a protective search, authorized under *Michigan*

*v. Long*, 463 U.S. 1032 (1983).[3] In *Long*, the Supreme Court ruled that officers conducting a *Terry* stop may carry out a protective search of the suspect's vehicle if they have a reasonable belief that the suspect is dangerous and may gain control of weapons inside the vehicle. *See id.* at 1049-50. Such a protective search is authorized even if the suspect is under police restraint at the time the search is conducted, because the suspect may be able to escape such restraint, or may later regain access to the vehicle if he is not arrested. *See id.* at 1051-52; *United States v. Holmes*, 376 F.3d 270, 280 (4th Cir. 2004).

Elston contends that *Long* is inapposite here, because Officer Hicks testified that, even if he had not arrested Elston, he would not have allowed Elston to drive the truck due to Elston's intoxication. Elston's assertion in that regard, however, misses the point. *Long*'s rationale is that a suspect who is temporarily under police restraint might nonetheless, at some later point in the encounter, have the chance to retrieve a weapon from his vehicle. Whether the suspect would be allowed to drive the vehicle away from the scene is immaterial to the *Long* inquiry. Here, if the officers had not arrested Elston — still a possibility during the *Terry* stop — he would have been released from the officers' physical control, creating a risk that he could retrieve his 9mm handgun from the truck. Under the standard spelled out in *Long*, the officers were authorized to conduct a protective search of Elston's truck in conjunction with the *Terry* stop. Elston's contrary contention is therefore without merit.

---

[3]As we have explained, the record contains conflicting evidence regarding Officer Reed's investigation of Elston's truck. Reed's written report of January 20, 2005 (which, according to counsel at oral argument, was admitted at the suppression hearing for all purposes), asserted that Reed observed the handgun in Elston's truck only after opening the driver-side door. In his testimony of April 14, 2005, however, Reed stated that Elston had left the door open after exiting the vehicle, allowing Reed to observe the handgun from outside the truck. The district court made no finding on which of Officer Reed's accounts was the correct one, nor does the court's reasoning clearly indicate which of the two versions it credited. In any event, we conclude that Reed was authorized to search Elston's truck, and so the court's failure to expressly resolve this apparent conflict is irrelevant to our disposition of this appeal.

## III.

For the foregoing reasons, we affirm the ruling of the district court on the suppression motion.

*AFFIRMED*