<u>UNPUBLISHED</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 09-4481

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MARTHA ALICE MITCHELL,

Defendant - Appellant.

Appeal from the United States District Court for the Southern District of West Virginia at Charleston.  John T. Copenhaver, Jr., District Judge.  (2:08-cr-00233-1)

Argued:  March 26, 2010                Decided:  July 21, 2010

Before TRAXLER, Chief Judge, and GREGORY and AGEE, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Jonathan D. Byrne, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant.  Blaire L. Malkin, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.  **ON BRIEF:** Mary Lou Newberger, Federal Public Defender, Christian M. Capece, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant.  Charles T. Miller, United States Attorney, Charleston, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Martha Alice Mitchell ("Mitchell") pled guilty to one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (2006), and one count of possession of a sawed-off shotgun, in violation of 26 U.S.C. § 5861(d) (2006). Mitchell's plea was conditional on her right to appeal the district court's order denying her motion to suppress the evidence seized by police at the time of her arrest. For the following reasons, we affirm the district court's judgment.

I.

At the suppression hearing, former police officer Carl Hammons ("Hammons") testified that he received a radio dispatch on November 3, 2004, informing him that a woman inside the West Side Café ("the café") had called 911 about a disturbance. The caller reported to the 911 operator that a black female had jumped in her car as though she were going to steal it, had a sawed-off shotgun wrapped in a sweater, and that she was threatening to kill her. When the call was initiated, the caller stated that the suspect was currently sitting in the caller's car, a burgundy Camaro, outside of the café. As the caller remained on the line, she informed the operator that the suspect was coming inside the café.

2

Further, the caller gave her name, Amy Stairn ("Stairn"), to the 911 operator. However, the dispatcher did not relay the caller's name to Hammons, as this "would be unusual on the initial call." (J.A. 58). Stairn "remained on the telephone line throughout the events." (J.A. 111). The 911 operator had the phone number of the open line with Stairn, which was an unblocked landline.

Hammons and several other officers responded to the dispatch, arriving at the café eight minutes after the 911 operator received the call from Stairn. As he arrived on the scene, Hammons testified that he "observed what appeared to be a maroon Camaro sitting in front of the establishment," which was "consistent with the [911] call," although he "did not observe anyone sitting in the [car]." (J.A. 50, 51).

Hammons proceeded toward the entrance of the café and "observed [the inside of the café] for a short period of time." (J.A. 50). Two white males exited the café and Hammons spoke briefly with each of the men, asking "if there was a disturbance inside the establishment," to which both men responded in the negative. (J.A. 50).

While remaining outside the café but looking in through a window, Hammons observed a black female, later identified as Mitchell. Although Hammons acknowledged that he was not able to see the entirety of the café's interior from his vantage point,

3

Mitchell was the only black female visible. Moments later, Mitchell exited the café. Hammons and the other officers drew their weapons and attempted to question her. Mitchell refused to stop, and she also refused "several commands" for her to "remove her hands from her pockets." (J.A. 51).

After Mitchell disobeyed his commands, Hammons forcibly placed her hands against the wall of the café and conducted a pat down search. Another officer seized Mitchell's backpack in the interest of "officer safety," and because it was "the most logical place for her to conceal a shotgun." (J.A. 53). That officer conducted a pat down of the backpack, felt a shotgun inside, and removed it from the backpack.

Based on the suppression hearing testimony, the district court found:

> Those circumstances, coupled with the officers' suspicion that she was the subject of the call which was enhanced by both her nervous demeanor and her refusal to remove her hands from her pockets when she was directed to do so for officer safety, caused the officers at that time to draw their weapons. At that point the officers were entitled for officer safety as well to pat her down, including the backpack she was wearing. In the course of the pat-down by Officer Bass-Straughter, the officer felt an object consistent with that of a sawed-off shotgun, which she then pulled from the backpack. Shortly thereafter, a single shell would also be found in the backpack.

(J.A. 110-11).

The district court also found that the 911 call was reliable even though Hammons did not know the caller's name

4

because "[t]he caller identified herself by name and remained on the telephone line throughout . . . and indeed remained in the [café] throughout that period from which her call was made." (J.A. 111). Thus, the "statements to the 911 operator were . . . readily verifiable and attested to her credibility in her assertion that the black female was in possession of a sawed-off shotgun and had threatened the caller's life." (J.A. 111).

The district court concluded that:

> [u]nder all these circumstances, the officers had an articulable reasonable suspicion that the black female who exited the café, and who was not only nervous in demeanor, but refusing to remove her hands from her pockets as directed, was the individual about whom the caller had spoken to the 911 operator and was in possession in her backpack of the sawed-off shotgun at issue in this case.

(J.A. 111-12). The district court further emphasized that, "for the safety of both the officers and the patrons at the café, as well as any passersby in the area of the café, it would have been imprudent for the officers to have acted other than they did." (J.A. 112).

Mitchell was sentenced to twenty-seven months in prison. She timely filed an appeal from the judgment of the district court and this Court has jurisdiction pursuant to 28 U.S.C. § 1291 (2006).

5

On appeal, Mitchell challenges the district court's denial of her motion to suppress. She argues first that the district court "erred by concluding that the telephone call that instigated the stop was not actually an anonymous tip." (Appellant's Br. 8). Because Stairn's name was not given to the police by the 911 dispatcher and, therefore, the responding officers considered the call to be from "an unknown location by an unknown caller," (Appellant's Br. 10), Mitchell contends that the call should have been considered an anonymous tip. She asserts that, without sufficient corroboration, the anonymous tip does not properly serve as a basis for reasonable suspicion to support the stop. Mitchell also alleges that the district court made a factual error when it relied on Hammons' testimony rather than the police reports prepared soon after Mitchell was arrested.

This Court reviews the district court's legal conclusions de novo, United States v. Reaves, 512 F.3d 123, 126 (4th Cir. 2008), and its factual findings for clear error, giving "due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Ornelas v. United States, 517 U.S. 690, 699 (1996). "A factual finding is clearly erroneous when we are left with the definite and firm conviction that a mistake has been committed." United States v. Stevenson,

396 F.3d 538, 542 (4th Cir. 2005) (internal quotations omitted). In reviewing the denial of a motion to suppress, this Court construes "the facts in the light most favorable to the government." United States v. Griffin, 589 F.3d 148, 150 (4th Cir. 2009).

Although Fourth Amendment "protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest[,] . . . the balance between the public interest and the individual's right to personal security tilts in favor of a standard less than probable cause in such cases . . . ." United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation omitted). Instead, pursuant to Terry v. Ohio, 392 U.S. 1 (1968), a police officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). In order to satisfy this standard, the officer "must be able to articulate something more than [a] hunch," and must have "some minimal level of objective justification for making the stop." United States v. Sokolow, 490 U.S. 1, 7 (1989) (internal quotation omitted).

In assessing whether an officer had a reasonable, articulable suspicion to support a stop, the reviewing court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and

7

objective basis' for suspecting legal wrongdoing." Arvizu, 534 U.S. at 273 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). The reviewing court should also "give due weight to common sense judgments reached by officers in light of their experience and training." United States v. Perkins, 363 F.3d 317, 321 (4th Cir. 2004).

"In cases where an informant's tip supplies part of the basis for reasonable suspicion, we must ensure that the tip possesses sufficient indicia of reliability." Id. at 323. "Where the informant is known . . ., an officer can judge the credibility of the tipster firsthand and thus confirm whether the tip is sufficiently reliable to support reasonable suspicion." Id. However, "[w]here a tip is anonymous, it must be accompanied by some corroborative elements that establish the tip's reliability." Id.

A.

To resolve this appeal, we need not determine whether the tip in this case was either categorically anonymous or non-anonymous, as a matter of law, since the view that "tips fall into two stark categories that are wholly anonymous or wholly non-anonymous is inconsistent both with reality and with Fourth Amendment law. For in reality, tips fall somewhere on a spectrum of reliability . . . ." Id. at 324. Instead we find

8

that, considering the totality of the circumstances, reasonable suspicion existed to search Mitchell as the tip was "accompanied by some corroborative elements that establish[ed] the tip's reliability," Id. at 323, and was based on the officers' personal observations at the scene.

Although this Court has declined to categorically answer the question of "whether a 911 call is anonymous when only the 911 operator knows the caller's identity," United States v. Elston, 479 F.3d 314, 318 n.2 (4th Cir. 2007), this Court's decisions in United States v. Quarles, 330 F.3d 650 (4th Cir. 2003), and Elston are instructive. In Quarles, an informant called 911 with information about possible illegal activity. Although he remained on the line, the caller did not identify himself by name to the 911 operator or to the investigating officers until the end of the call, after the Terry stop in that case had been conducted. Id. at 652. The Quarles Court held that the call was not anonymous, because "[r]egardless of when the caller gave his name, the caller did identify himself to the dispatcher . . . ." Id. at 655. The caller also "stayed on the 911 line . . ., watching the defendant and providing the dispatcher with on-going information regarding the defendant and even witnessing the police approaching the defendant." Id. The caller also gave personal information which "provided sufficient information to the police that he could have been held

9

accountable for his statements." Id. at 656. Thus, the Court found that "there was sufficient information given to accurately identify the caller," which "lends support to his credibility and reliability." Id. at 655.

This Court's subsequent decision in Elston cited and expanded upon the factors in Quarles. The Elston Court noted that "factors that can indicate the reliability of anonymous information" include whether the call "discloses the basis of the informant's knowledge," whether "the informant indicates that her report is based on her contemporaneous personal observation of the call's subject," and whether the informant "disclos[es] information that would enable authorities to identify her if they deem it necessary to do so." Elston, 479 F.3d at 318.

In this case, Stairn's call satisfies the factors put forth in Quarles and Elston. First, while the caller in Quarles only gave his name to the 911 operator after the stop had been made, Stairn gave her name to the 911 operator at the beginning of the call. Furthermore, Stairn "provided sufficient information . . . [so] that [she] could have been held accountable for [her] statements;" namely, she gave her name, information about "the color and make of [her] own car," and her physical location to the 911 operator. Quarles, 330 F.3d at 656. Stairn also "stayed on the 911 line . . ., watching the defendant and providing the

10

dispatcher with on-going information regarding the defendant." Id. at 655. Finally, Stairn was calling from an unblocked, identifiable landline, instead of a mobile cell phone as in Quarles. Therefore, "the caller in this instance provided enough information to 'test [her] knowledge or credibility.'" Id. (quoting Florida v. J.L., 529 U.S. 266, 271 (2000)).

B.

Importantly, unlike in Florida v. J.L., 529 U.S. 266 (2000), the officers in the case at hand also had substantial corroboration of the information provided in the tip. In J.L., officers stopped a man based solely on an anonymous caller's description that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." 529 U.S. at 266. The officers stopped a man matching that description, even though they "had no reason to suspect [him] of illegal conduct," as they "did not see a firearm or observe any unusual movements." Id. The J.L. Court held that the stop violated the defendant's rights because "the officers' suspicion that J.L. was carrying a weapon arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller." Id. at 270 (emphasis added).

The case at bar is clearly distinguishable from J.L. First, this is not a case where the tip call to police is "from

11

an unknown location by an unknown caller." Id. at 270. Stairn was calling from a known location with a fixed telephone number. She "revealed her general location and her basis of knowledge, as the nature and substance of her tip made clear that she was in close proximity to the [criminal activity] and that she was observing [it] while she was on the phone." Perkins, 363 F.3d at 324. Also unlike in J.L., Stairn "explained how [s]he knew about the [criminal activity] [and] supplied a[] basis for believing [s]he had inside information about [Mitchell]." J.L., 529 U.S. at 271. Therefore, "[t]he tipster's basis of knowledge—a contemporaneous viewing of the suspicious activity—enhanced the tip's reliability." Perkins, 363 F.3d at 322.

Hammons also properly relied on his own personal observations of the scene and his knowledge and experiences as a police officer. The café was in a high-crime area. See United States v. Mayo, 361 F.3d 802, 805 (4th Cir. 2004) (citing "whether the stop occurred in a high-crime area" as a factor "traditionally relied upon by police officers"). The burgundy Camaro outside of the café corroborated information given by Stairn. Although Hammons was not able to see the entirety of the inside of the café, Mitchell was the only person he saw in the café who matched the description given by Stairn. Mitchell was also wearing a backpack, which could have contained a sawed-off shotgun.

12

Finally, we note that it is "[o]f additional significance" that Stairn "was reporting an imminent threat to public safety—an individual who had expressly threatened to shoot someone in the very near future. . . . The imminent threat faced by these officers carries substantial weight in assessing the reasonableness of their actions . . . ." Elston, 479 F.3d at 319.

Thus, even if the tip were anonymous, there existed "[]sufficient indicia of reliability to support the tip," Perkins, 363 F.3d at 324, and therefore the stop was "authorized by a reasonable suspicion that criminal activity [was] afoot." Mayo, 361 F.3d at 807. Consequently, Hammons and the other officers on the scene were entitled to protect themselves during the stop "by conducting a search for weapons," both on Mitchell's person and inside her backpack. United States v. Burton, 228 F.3d 524, 528 (4th Cir. 2000).

C.

Nor did the district court clearly err when it relied on the testimony given by Hammons during the suppression hearing. Although there were some discrepancies between Hammons' testimony and the written report, as well as additional details given, this Court "defer[s] to the district court's credibility findings, as 'it is the role of the district court to observe

13

witnesses and weigh their credibility during a pretrial motion to suppress.'" United States v. Griffin, 589 F.3d 148, 150-51 n.1 (4th Cir. 2009) (quoting United States v. Abu Ali, 528 F.3d 210, 232 (4th Cir. 2008)). Consequently, because "the district court's account of the evidence is plausible in light of the record viewed in its entirety," Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985), we defer to the district court's credibility determination.

## III.

For the foregoing reasons, we hold that the district court did not err in denying Mitchell's motion to suppress. Accordingly, the judgment of the district court is

AFFIRMED.