**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————

**No. 10-4889**

—————————

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

        v.

MARCUS HILL,

                Defendant - Appellant.

—————————

Appeal from the United States District Court for the District of
Maryland, at Baltimore.    William D. Quarles, Jr., District
Judge.  (1:09-cr-00446-WDQ-1)

—————————

Argued:  March 23, 2012              Decided:  April 19, 2012

—————————

Before DAVIS and DIAZ, Circuit Judges, and Jackson L. KISER,
Senior United States District Judge for the Western District of
Virginia, sitting by designation.

—————————

Affirmed by unpublished opinion.  Judge Davis wrote the opinion,
in which Judge Diaz and Senior Judge Kiser joined.

—————————

**ARGUED:** Meghan Suzanne Skelton, OFFICE OF THE FEDERAL PUBLIC
DEFENDER, Greenbelt, Maryland, for Appellant.    Tonya Nicole
Kelly, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore,
Maryland, for Appellee.  **ON BRIEF:** James Wyda, Federal Public
Defender, Baltimore, Maryland, for Appellant.     Rod  J.
Rosenstein, United States Attorney, Christopher M.  Mason,
Special Assistant United States Attorney, Alee Pagnotti, Second

Year Law Student, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

DAVIS, Circuit Judge:

Appellant Marcus Hill was charged in a single count indictment with possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). Hill filed a motion to suppress the firearm (and other evidence) based on the Fourth Amendment. After a hearing, the district court denied the motion to suppress. Hill proceeded to trial, at the conclusion of which the district court denied his Rule 29 motion for judgment of acquittal, which was based on his contention that the government adduced insufficient evidence of his knowing possession of the firearm. The jury returned a guilty verdict on the single charge. At sentencing, over Hill's objection, the district court applied the Armed Career Criminal Act, 18 U.S.C. § 924(e) (ACCA), and imposed a mandatory minimum sentence of 180 months of imprisonment. Hill filed this timely appeal.

Before us, Hill contends the district court erred in (1) denying the motion to suppress; (2) denying the motion for judgment of acquittal; and (3) applying the ACCA. For the following reasons, we affirm.

I.

A.

On January 13, 2009, around 3:00 a.m., Hill drove in his silver Buick Park Avenue, which he had owned for two to three

3

months, to pick up his girlfriend, Nekia Bennett, who had ended her shift as an employee of a contract firm that transported detainees and inmates for the Baltimore County Police Department.[1] As required by her job, Bennett carried a handgun, which that morning was holstered on her left side.

When Hill arrived to pick up Bennett, she was in a transport vehicle with a male co-worker with whom Hill had previously argued. When Bennett entered Hill's car, she noticed he was upset. He told her that the disagreement with her male co-worker was getting out of control and that the co-worker had been threatening him. The argument escalated. Hill yelled, punched the steering wheel, and pushed Bennett's shoulder to get her to look at him. At one point Hill put Bennett's hand on the pocket of his sweatpants and she felt a hard object. Hill stated, "You see how they got me out here?" J.A. 97. Based on this statement, Bennett believed the object in Hill's pocket was a gun.

Bennett was exhausted, having just finished her night shift, and had had only six hours of sleep in the preceding

---

[1] We set forth the facts in the light most favorable to the government's view of the case as the government prevailed both on the motion to suppress, United States v. Hernandez–Mendez, 626 F.3d 203, 206 (4th Cir. 2010), cert. denied, 131 S.Ct. 1833 (2011), as well as at trial, United States v. Herder, 594 F.3d 352, 358 (4th Cir.), cert. denied, 130 S.Ct. 3440 (2010).

thirty hours. Hill had never been violent, had never hit her, and had never been abusive in any way; still, Bennett wanted to avoid arguing with him, and so she asked him to stop at a 7-Eleven, apparently intending to make small purchases.

As the Buick pulled up to the 7-Eleven, Hill and Bennett observed a marked police car in the parking lot. As Bennett turned to get out of the car, Hill grabbed her wrist and said, "Don't play with me." J.A. 102. Once inside the 7-Eleven, Bennett walked past two police officers, Sergeant Byron Conaway and Sergeant Amado Alvarez, standing at the cashier's counter. Conaway and Alvarez were twelve-year veterans of the Baltimore Police Department ("BPD"). They had finished their shift for the night and had stopped at the 7-Eleven for refreshments. As Bennett walked past the officers, Conaway noticed that Bennett had a handgun holstered on her left hip and alerted Alvarez. The officers concluded (erroneously) that Bennett was a state correctional officer based on the uniform pants she was wearing, and paid no further attention to her at that time.

Bennett picked up an item and, just two minutes after entering the store, took the item to the cashier, near where the officers were standing, to Bennett's left. While paying for her item, Bennett asked the cashier for a pen. She took a receipt, turned it over, and wrote the word "Help" on the back. She slid the receipt down the counter to Conaway and then, without saying

5

a word to the officers, exited the store. The officers did not stop her or ask her any questions. Bennett later testified that she passed the note to the officers "because of the situation [she] was in . . . with Mr. Hill," J.A. 105, explaining, "I just wanted the situation that we was going through to be resolved." J.A. 106.

Conaway showed the note to Alvarez. Believing Bennett was in "distress" and possibly in a situation "a little bit more than what she could handle," J.A. 163, 213, they followed Bennett out to the parking lot, where she had already reentered Hill's car on the front passenger side. Conaway drew his weapon as he exited the store, even before seeing anyone in the vehicle with Bennett. Knowing that Bennett was armed and that the gun she was carrying was on her left side - which would be the side closer to the driver, Hill - the officers approached the front of the car. With guns drawn, and standing just a few feet from the sides of the car, they ordered Hill and Bennett to show their hands and exit the vehicle. Conaway testified that he took these actions immediately without first investigating in some other manner because he did not understand why Bennett needed help. "I couldn't understand why she would need help, being as though she was an armed person, so that kind of sparked my interest a bit." J.A. 212.

6

Hill did not immediately comply with the order to show his hands. Conaway testified that he saw Hill reach to his right side, next to the center console and near where Bennett's gun was holstered; Alvarez testified that he saw Hill reach toward his waist. Neither officer saw Hill with a weapon. Conaway and Alvarez continued to order Bennett and Hill to show their hands. Bennett complied and exited the vehicle, but Hill did not. Conaway then fired his weapon twice; one shot missed and the other hit Hill in the abdomen. Hill collapsed over the passenger seat. Conaway testified that less than twenty seconds elapsed between when he exited the 7-Eleven and when he fired his weapon.

Having just been shot, Hill showed his hands. Alvarez pulled Hill from the car, laid him on the ground, handcuffed him, and patted him down. He found no weapon, only Hill's paycheck stub. Alvarez also did a preliminary search of the interior of the car, including the floor and the seats (although without a flashlight), and found nothing. Alvarez and Conaway called for back-up and for medics. Hill was transported by ambulance to the hospital, under police guard.

Detectives assigned to the BPD Homicide Unit arrived and took control of the scene, as is standard procedure in all shootings involving police. The detectives began investigating the circumstances that led Conaway to shoot Hill; at that point,

7

they had no information suggesting or indicating that Hill had committed any crime or possessed any weapons or contraband.

Bennett was transported to BPD headquarters. She was ordered to surrender her purse, her keys, her work-issued firearm, and other personal effects to the police. She was frazzled, crying, and traumatized by what had happened to Hill. After waiting some time, she was interviewed by two BPD detectives: Juan Diaz and Michael Moran. They asked her many questions about firearms, but she had never seen Hill with a gun, neither that night nor on any other occasion. After questioning her for about an hour, the detectives turned on a tape recorder and took a recorded statement. In that statement, she told them about the argument she and Hill had had in the car, and why she wanted to get out of the car. She said that Hill "pulled my wrist and . . . patted his sweatpants, it was like . . . don't play with me. You know I don't like the police." J.A. 547. Although by that point the police knew Hill was unarmed when he was removed from the car, Bennett explained that when Hill had had her pat his pocket, she felt an object she thought might have been a gun.

By that point Hill's car had been towed to the BPD crime lab evidence bay. Diaz prepared an application for a warrant authorizing a search of Hill's vehicle. In four separate places the application and warrant stated that the purpose of the

8

warrant was to seek evidence of a suspected murder. The application stated that the police "have reason to believe" that "there are now being concealed certain property, namely, weapons, ammunitions, papers, or any item pertaining to the crime of murder." J.A. 28. The application states in a separate place that the crime under investigation is "first degree murder" and cites the Maryland Annotated Code section for first-degree murder. Id. The warrant itself, which Diaz also filled out, stated that the police were authorized to search for evidence relating to the crime of first-degree murder. Diaz later conceded that the police never believed they were investigating a murder. He testified the references to homicide were the result of an "honest mistake." J.A. 315.

Notwithstanding the erroneous mentions of murder, the body of the affidavit attached to the warrant application set forth a substantially accurate narrative of the night's events. Diaz attested that the police had shot Hill in front of the 7-Eleven after they had been "approached by a female asking them for help." J.A. 31. The affidavit states that the female left the store and got into the passenger seat of a car in which Hill, the registered owner, was sitting in the driver's seat. Officers then gave "verbal commands to both occupants [to] show[] their hands and to please exited [sic] the vehicle." Id. Diaz further affirmed, "Marcus Hill refused to show his hands and exit the

9

vehicle. Subsequently, in fear for their safety, Marcus Hill was shot while inside the vehicle." Id. Diaz also wrote, "In furtherance investigation [sic] after interviewing the witness, investigators learned that moments before the shooting, the female received an assault by threat with a possible gun by Marcus Hill." Id. Diaz presented the warrant application to a judge of the District Court of Maryland for Baltimore City who issued the warrant.

During the subsequent search of the car, officers found and seized registration papers confirming that Hill was the owner of the vehicle. Two utility bills and various financial documents in Hill's name were also in the car. Finally, they found a Taurus PT-22 .22-caliber semi-automatic pistol inside a black stocking behind the front passenger seat, wedged between the seat and the floor. The officers removed the gun from the stocking and found that it was entirely covered in rust. None of the officers present were able to render the firearm safe because of the extent of the rust. When they were eventually able to extract the magazine, officers found that the magazine and all of the cartridges were also covered in rust. At trial, Special Agent Daniel Kerwin of the Bureau of Alcohol, Tobacco, Firearms and Explosives explained that although the gun was inoperable, it still met the definition of a firearm as that term is defined in 18 U.S.C. § 921(a)(3).

10

On August 13, 2009, Hill was indicted on one count under 18 U.S.C. § 922(g)(1) in the District of Maryland for possessing the Taurus PT-22 firearm after having previously been convicted of a felony. Hill moved to suppress the gun (and the other items seized from the Buick) on the ground that the state search warrant was invalid because the affidavit offered in support of the warrant application did not provide probable cause, for three reasons. First, he argued the affidavit, which was based entirely on statements from the "female" [Bennett] who asserted that she had "received an assault threat by possible gun by Marcus Hill," lacked evidence of the informant's "veracity" or the basis of her knowledge, and therefore lacked probable cause.

Second, he argued the false references to the crime of murder in the affidavit rendered the warrant invalid. In the section of the warrant describing the property to be seized, it states "weapons, ammunition, papers of any item [sic] pertaining to the crime of murder." J.A. 29, 38, and yet "no evidence was presented to the issuing Judge concerning a murder." J.A. 17. Thus, he argued, the warrant was insufficiently particularized, and the search of Hill's car was beyond the scope of the warrant.

Third, and alternatively, Hill argued the warrant was invalid under Franks v. Delaware, 438 U.S. 154 (1978), because

11

in the affidavit Diaz omitted the fact that Bennett's stated belief that Hill had a gun in his pocket had turned out to be false (at least as of the time when Hill was removed from the car). Including this information, Hill argued, would have "diminished the probability that evidence of a crime was located in the car." J.A. 40.

Neither Hill's motion nor his reply to the government's opposition argued that the officers' actions in the 7-Eleven parking lot constituted an unlawful seizure or otherwise violated his Fourth Amendment rights.

In opposition to the motion, the government argued the warrant was valid because Hill had threatened Bennett when he "was possibly in possession of a handgun." J.A. 23. The warrant was necessary, the government argued, to "ascertain if Hill possessed a gun as Bennett indic[a]ted, which would, in and of itself, be a violation of Maryland law," and also to "assist in the determination of whether Hill should be prosecuted for an assault on Bennett." Id. While acknowledging the references to the crime of murder were false, the government argued those references did not invalidate the warrant for two reasons: (1) "only the place to be searched and the persons or things to be seized must be stated with particularity" and "any efforts to expand this requirement to include other warrant provisions ha[ve] been rejected," J.A. 24 (citing United States v. Grubbs,

12

547 U.S. 90 (2006)); and (2) "the reference to murder was nothing more than an 'honest mistake,'" and therefore does not require invalidation of the warrant, id. (citing United States v. Owens, 848 F.2d 462, 463-64 (4th Cir. 1988)). Finally, the government argued that even if the affidavit lacked probable cause, the good faith exception to the exclusionary rule applied.

On May 17, 2010, the first day of trial, the district court held a hearing on Hill's motion to suppress (in addition to other motions not relevant to this appeal). Defense counsel reiterated Hill's arguments, noting that Hill's argument "first and foremost" was that the warrant affidavit failed to establish probable cause. J.A. 57. Ultimately, the district judge denied the motion from the bench, "[f]or reasons that will be explained in a memorandum to be issued" at a later date. J.A. 67. On May 20, 2010, the court filed a Memorandum Opinion setting forth the reasons for its denial of Hill's motion to suppress. United States v. Hill, 2010 WL 2038995 (D. Md. May 20, 2010).

The district court explained that the affidavit supporting the warrant application established the following facts:

> (1) a woman had requested help from two officers in a 7-Eleven store; (2) she had left the 7-Eleven and got into a 2000 silver Buick parked in front of the store; (3) Hill, the registered owner, was in the driver's seat of that car; (4) Hill had threatened to assault the woman with what she thought was a gun; (5) Hill refused to comply with the officers' request that he

13

show his hands and leave the vehicle; and (6) Hill was shot inside the car.

Id. at *2. Based on these facts, the district court concluded the warrant was supported by probable cause. Id. The court also concluded the references to "murder" did not invalidate the warrant because "[n]either the Fourth Amendment nor Maryland law requires the warrant to identify the alleged crime," and the Fourth Amendment "'allow[s] some latitude for honest mistakes' made in connection with warrants." Id. (quoting Owens, 848 F.2d at 464). "Because there was probable cause," the court concluded, "the warrant's reference to 'first degree murder' was [a] harmless error" by Detective Diaz. Id.

The parties proceeded to trial, during which they stipulated that Hill was prohibited from possessing a handgun because of a prior felony conviction. At the close of the government's case and again at the close of all the evidence, Hill moved for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, arguing the evidence presented was insufficient to sustain a finding beyond a reasonable doubt that Hill exercised knowing constructive possession of the firearm seized from the Buick. J.A. 426, 444-45. The district court denied both motions. On May 19, 2010, the jury convicted Hill of the sole count with which he was charged.

14

On August 9, 2010, the parties appeared for sentencing. A probation officer had prepared a presentence report (PSR), which detailed Hill's criminal history, including the following state court convictions:

(1) <u>March 10, 2000</u>: possession with intent to distribute a controlled substance / possession of a handgun;

(2) <u>July 25, 2001</u>: possession with intent to distribute a controlled substance;

(3) <u>April 17, 2007</u>: distribution of a controlled substance and possession with intent to distribute a controlled substance (<u>Alford</u> plea)

J.A. 758–59.

As for the April 2007 conviction, the one Hill argues is not an ACCA predicate, the indictment filed in state court alleges, in pertinent part, that the defendant "did distribute a certain Controlled Dangerous Substance of Schedule # II, to wit: cocaine, which is a narcotic drug, . . . in violation of Criminal Law Article, Section 5-602 . . . ." J.A. 698. A conviction for distribution of cocaine carries a maximum penalty of 20 years under Maryland law. Therefore, the PSR determined that the 2007 conviction was (like the other two convictions listed above) a "serious drug offense" as defined in 18 U.S.C. § 924(e)(2)(A). At the time Hill was arrested for the instant offense, he was on probation for the 2007 convictions. The PSR

calculated Hill's advisory guidelines range to be 210-262 months' imprisonment. In support of the ACCA predicates, the government provided certified copies of the state court judgments of conviction related to Hill's three prior ACCA qualifying convictions, along with the docket entries and charging documents for each.

Hill contested the ACCA determination. First, he argued the Maryland possession-with-intent-to-distribute statute is not categorically a serious drug offense, and that the government's documentation was insufficient to prove that Hill's convictions were actually ACCA predicates. Second, he argued (anticipating our later decision in United States v. Alston, 611 F.3d 219 (2010)) that because his April 2007 conviction was the result of an Alford plea, it could not be considered an ACCA predicate offense.

The court rejected Hill's arguments and sentenced him to the 180-month mandatory minimum, followed by five years of supervised release. Hill filed a timely notice of appeal.


II.

On appeal, Hill argues the district court erred in denying his motion to suppress, in denying his motion for a judgment of acquittal, and in sentencing him as an armed career criminal. We consider these issues in turn.

16

A.

1.

As noted above, in the course of the suppression hearing in the district court, Hill argued the gun (and the other evidence seized from the Buick) should be suppressed because the <u>warrant</u> was invalid, for three reasons: (1) the affidavit in support of the warrant application did not provide evidence of the informant's veracity or the basis of her knowledge, thereby vitiating probable cause; (2) the warrant application falsely stated that the purpose of the warrant was to investigate a murder; and/or (3) the affidavit did not mention that Bennett had believed Hill had a gun in his pocket, a belief that later was proven wrong, and that omission rendered the warrant invalid. In his written motion to suppress, he also argued:

> 4. Because the investigation of this case is incomplete, Mr. Hill reserves the right to move for suppression of evidence based on grounds not now discernible such as, but not limited to, rights under <u>Franks v. Delaware</u>, 438 U.S. 154 (1978). Mr. Hill also reserves the right to supplement this Motion in the future.
>
> 5. Any additional searches and seizures that occurred in this matter, warrantless or otherwise, are also illegal and in violation of the Fourth Amendment.

J.A. 17.

On appeal, Hill has shifted gears. He advances the following contentions before us: (1) the warrant was facially invalid based on the references to murder; and (2) the gun (and

17

other evidence) should have been suppressed because the officers unlawfully seized Hill, i.e., without reasonable suspicion or probable cause, (a) when they pointed their guns at him; and/or (b) when they shot him, in either case thereby poisoning the later-obtained warrant. There is a serious question, however, whether Hill preserved his challenge to the admissibility of the evidence obtained from the car as to these latter grounds. Specifically, the issue presented is whether his arguments in the district court were adequate to preserve the arguments based on an alleged unconstitutional seizure ("seizure arguments").

If the arguments were preserved, we review legal determinations de novo and factual findings for clear error. United States v. Kellam, 568 F.3d 125, 132 (4th Cir. 2009). As to the arguments involving the existence or lack thereof of reasonable suspicion, we review "determinations of historical facts" for clear error; the "ultimate" question of whether there was reasonable suspicion is reviewed de novo. Ornelas v. United States, 517 U.S. 690, 691, 696-97 (1996). If the arguments were not preserved, we review for plain error. Fed. R. Crim. P. 52(b).

Hill contends he preserved his seizure arguments based on four theories:

First, he argues the arguments were preserved because he satisfied Federal Rule of Criminal Procedure 51(b). See

Appellant's Reply Br. at 2. Rule 51(b) provides that a party may "preserve a claim of error" by informing the court of either "the action the party wishes the court to take" or "the party's objection to the court's action and the grounds for that objection." Hill argues that because the first option -- informing the court of the action the party wishes the court to take (suppress the evidence) -- does not require a statement of specific grounds, and because he moved to suppress the gun, he preserved the argument that the gun should have been suppressed based on Hill's allegedly unlawful seizure in the parking lot.

Second, Hill argues he preserved the argument because his motion to suppress the gun ended with the following: "Any additional searches and seizures that occurred in this matter, warrantless or otherwise, are also illegal and in violation of the Fourth Amendment." J.A. 17. Hill cites no cases specifically addressing whether a catch-all, boilerplate argument like this one is sufficiently specific to preserve a particular argument in support of a motion to suppress.

Third, he argues he preserved his seizure arguments when he separately moved to suppress any "statements, admissions, or confessions" that may have been obtained unlawfully, although at the time of the motion Hill's counsel was not aware of any statements Hill had made. The motion also stated, "Any statements, admissions, or confessions were also the fruit of

19

<u>Mr. Hill's illegal arrest</u> and in violation of the Fourth Amendment of the United States Constitution."[2]

Fourth, in reliance on <u>Yee v. City of Escondido</u>, 503 U.S. 519 (1992),[3]

---

[2] Indeed, the district court denied the motion seeking suppression of certain statements Hill made. <u>See</u> 2010 WL 2038995, at *2. He does not challenge that ruling on appeal.

[3] In <u>Yee</u>, mobile park owners sued a municipality in state court alleging that a local rent control ordinance constituted an unconstitutional taking. 503 U.S. at 525. Their theory was that the ordinance constituted a physical occupation of their property, although portions of their complaint and briefing could have been read "to argue a regulatory taking." <u>Id.</u> at 534. In the Supreme Court, for the first time they argued that the ordinance constituted a regulatory taking. <u>Id.</u> The Court held the argument had not been forfeited because the park owners had "unquestionably raised a taking claim in the state courts." <u>Id.</u> The Court explained:

> Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below. Petitioners' arguments that the ordinance constitutes a taking in two different ways, by physical occupation and by regulation, are not separate claims. They are rather, separate arguments in support of a single claim – that the ordinance effects an unconstitutional taking. Having raised a taking claim in the state courts, therefore, petitioners could have formulated any argument they like in support of that claim here.

<u>Id.</u> at 534 (emphases in original).

Hill apparently argues <u>Yee</u> means he properly preserved the unlawful-seizure arguments because his request that the court suppress the gun was a "claim," and therefore the arguments he made in support of that "claim" do not limit the arguments he can raise on appeal.

20

and Illinois v. Gates, 462 U.S. 213, 219-220 (1983),[4] Hill contends that "[a]ny differences between what trial counsel urged orally at the motions hearing and the arguments in this appeal are simply ones of reasoning, not of claims"; because the "claim" is the same, the arguments are preserved. Id. at 3-4. He cites these cases for the proposition that a different "legal argument on appeal" does not render the argument unpreserved, so long as "the claim was still the same." Appellant's Reply Br. at

---

[4] In the seminal Gates opinion, a case on certiorari from the Illinois state courts, the Court considered whether to address an issue (namely, whether to fashion a good-faith exception to the exclusionary rule) that had not been addressed by the state courts. The Court declined to address the question because of the Court's practice of not addressing issues "not pressed or passed upon below" in state court. 462 U.S. at 219-20. It is true, as Hill notes, that the Court observed the following:

> [I]f the question were only an enlargement of the one mentioned in the assignment of errors, or if it were so connected with it in substance as to form but another ground or reason for alleging the invalidity of the [lower court's] judgment, we should have no hesitation in holding the assignment sufficient to permit the question to be now raised and argued. Parties are not confined here to the same arguments which were advanced in the courts below upon a Federal question there discussed.

Id. at 20 (quoting Dewey v. Des Moines, 173 U.S. 193, 197-198 (1899)). Of course, Justice White's concurring opinion in Gates, 462 U.S. at 246, in which he fully developed the good faith exception to the exclusionary rule, essentially became the opinion for the Court in the term following Gates. See United States v. Leon, 468 U.S. 897 (1984).

3-4 (citing <u>Yee</u>, 503 U.S. at 534, and <u>Gates</u>, 462 U.S. at 219-20).

2.

We are not persuaded by any of Hill's preservation theories. We agree with the government that Hill failed to preserve his seizure arguments because he did not raise them as distinct grounds in support of his motion to suppress. <u>See</u> <u>United States v. Ellis</u>, 326 F.3d 593, 599-600 (4th Cir. 2003)("Ellis first claims that the district court erred in denying his motions to suppress, arguing that the initial stop by the FBI agents was invalid because these federal agents lacked authority to stop him for violating a state traffic law. In the district court, however, Ellis did not assert the FBI agents' lack of authority as a basis for suppression; rather, he argued that the stop was primarily motivated by the agents' desire to investigate him for narcotics activity. Thus, we review Ellis' claims regarding the scope of the agents' authority for plain error."). <u>See</u> <u>also</u> <u>United States v. White</u>, 584 F.3d 935 (10th Cir. 2009), <u>cert.</u> <u>denied</u>, --- U.S. ----, 130 S. Ct. 1721 (2010):

> Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure requires that a party raise a motion to suppress before trial. A party who fails to do so "waives any Rule 12(b)(3) defense, objection, or request," although "[f]or good cause, the court may grant relief from the waiver." Fed. R. Crim. P. 12(e). This waiver rule applies not only when a defendant

22

fails to file any pretrial motion to suppress, but also when a defendant fails to assert a particular argument in a pretrial suppression motion that he did file . . . . To avoid waiving a particular argument, the party must make "sufficiently definite, specific, detailed and nonconjectural factual allegations supporting his suppression claim" in his pretrial motion.

Id. at 948-49 (citations omitted)[5]; United States v. Lockett, 406 F.3d 207, 212 (3d Cir. 2005) ("Therefore, in the context of a motion to suppress, a defendant must have advanced substantially the same theories of suppression in the district court as he or she seeks to rely upon in this Court."); United States v. Schwartz, 535 F.2d 160, 163 (2d Cir. 1976) ("The Government very properly points out that the failure to assert a particular ground in a pre-trial suppression motion operates as a waiver of the right to challenge the subsequent admission of evidence on that ground."), cert. denied, 430 U.S. 906 (1977); and see United States v. Chandia, 514 F.3d 365, 375 (4th Cir. 2008) ("In his motion to suppress filed in district court, Chandia did not expressly request a Franks hearing. Therefore, we review for plain error the issue of whether the district court should have held such a hearing. See Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 731–32 (1993)."). Moreover, whereas

---

[5] We note that, as contemplated by Rule 12, the district court "granted Hill's motion for leave to amend, supplement, withdraw, or file additional motions." See 2010 WL 2038995, at *1, n.1.

Federal Rule of Criminal Procedure 51 governs the preservation of most claimed errors in criminal cases, Federal Rule of Evidence 103(a) governs objections to the admission or suppression of evidence. Rule 103(a) expressly requires that, to preserve a claim of error in the admission of evidence, the party must "state[] the specific ground, unless it was apparent from the context." Fed. R. Evid. 103(a)(1)(B).

Thus, we are constrained to apply plain error review to Hill's argument that he was unlawfully seized in the 7-Eleven parking lot, and that the gun (and the other evidence seized from his car) constituted the fruit of that unlawful seizure that should have been suppressed.

We grant relief on the basis of plain error to an appellant such as Hill only when he establishes: (1) there was an error; (2) the error is plain; (3) the error affects substantial rights; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. United States v. Wilkinson, 137 F.3d 214, 223 (4th Cir. 1998) (quoting Olano, 507 U.S. at 732). An error is "plain" if it is "'clear' or, equivalently, 'obvious.'" Olano, 507 U.S. at 734. As to the validity of the warrant, the argument based on the affiant's "honest mistake" was preserved, so we would review the legal determinations related to that question de novo and any factual findings for clear error.

24

B.

1.

Hill argues the district court erred in admitting the gun (and other evidence seized from the car) because the officers unlawfully seized Hill when they pointed guns at him and when they shot him; both seizures constituted arrests, not Terry detentions; and in neither event was the seizure supported by probable cause. Alternatively, he argues that even if the first seizure (the officers' drawing weapons accompanied by orders to exit the vehicle) was a Terry detention, the officers lacked reasonable suspicion. Further, he argues, the illegality of one or both of those seizures "poisoned" the search warrant, and the good faith exception does not apply.

The first question is whether, at the moment the officers exited the 7-Eleven and drew their guns on Hill and Bennett, Hill was under de facto arrest, or subject merely to a lesser detention in the nature of an investigatory stop. This is a potentially dispositive issue, because if the seizure amounted to an arrest of Hill, then it was most assuredly unlawful; the government concedes, and we agree, there was not probable cause at that time to believe Hill had committed a crime.

Whether a person is under arrest or merely subjected to a temporary detention depends on whether "the suspect's freedom of action is curtailed to a degree associated with formal arrest."

25

United States v. Elston, 479 F.3d 314, 319 (4th Cir. 2007) (quoting Park v. Shiflett, 250 F.3d 843, 850 (4th Cir. 2001)). This is a two-part inquiry, one pertaining to time and the other to scope. First, the seizure must have "last[ed] no longer than necessary to verify or dispel the officer's suspicion." United States v. Leshuk, 65 F.3d 1105, 1109 (4th Cir. 1995) (citing Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion), and United States v. Sinclair, 983 F.2d 598, 602 (4th Cir. 1993)). Second, the actions of the officers must have been "necessary to protect their safety, maintain the status quo, and confirm or dispel their suspicions." Id. at 1110.

A person is not necessarily under arrest even if a "reasonable person would have felt free to leave in the circumstances of his initial detention." Elston, 479 F.3d at 319. "A brief but complete restriction of liberty [can be] valid under Terry." Leshuk, 65 F.3d at 1109. "Terry stops customarily involve detentions where the person detained is not technically free to leave while the officer pursues the investigation." Id. (internal quotation marks omitted). "[W]e have concluded that drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for Miranda purposes." Id. at 1109-10.

26

Hill argues the parking lot encounter was a full-blown arrest because "[a] reasonable person in Hill's position in the early morning of January 13, 2009, would not have believed that he was free to leave or terminate the encounter when, seated in a parked car, Conaway and Alvarez pulled their weapons and pointed them at him." Appellant's Br. at 17. The seizure quickly escalated to the level of an arrest, he argues, because of "the nature of the police intrusion and the level of restraint on Hill's freedom." Id. at 18. Furthermore, in reliance on United States v. Mendenhall, 446 U.S. 544 (1980), he argues "the threatening stance of the police, combined with the weapons pointed at a seated man," along with the facts that Conaway was "yelling demands and orders" and that Hill "made no attempt to flee," establish that the seizure was an arrest, not an investigatory stop. Appellant's Br. at 19. We reject Hill's contention.

As a legal matter, Hill's argument confuses the standard for a "seizure" and an "arrest." Most importantly, Mendenhall is inapposite, because it addressed when an officer's encounter with a person rises to the level of a Terry stop, requiring reasonable suspicion -- not when a Terry stop rises to the level of an arrest. The government does not dispute that Hill was seized from the moment the officers drew their weapons, which required at least reasonable suspicion; the question is whether

27

the seizure was an arrest or a Terry stop. As to that question, the standard is that discussed in Elston and Leshuk.

As a factual matter, our review is hampered by the fact that Hill did not argue before the district court that (1) he was under arrest at the time and (2) the arrest was unlawful. Because he did not make these arguments, we have no factual findings on which to decide either of these questions. We know that less than twenty seconds elapsed between the moment when Conaway exited the 7-Eleven and when he fired his weapon, because Conaway testified to that timing apparently without contradiction. And we have the surveillance video from the 7-Eleven, which shows the officers exiting the store and drawing their weapons, although there is no footage of the car itself. But the district court was never asked to determine, for example, how much time (or what reasonable technique) was reasonably "necessary to verify or dispel the officer's suspicion" that Hill was armed or otherwise a threat, to Bennett or to themselves. See Leshuk, 65 F.3d at 1109.

In the absence of such findings by the district court, the question is thus: Is it "clear" or "obvious" from the record before us, see Olano, 507 U.S. at 734, that Hill was under arrest from the moment the officers drew their weapons? We think not. For the reasons described above, drawing of weapons does not necessarily convert a Terry detention into an arrest. The

28

entire encounter was less than 20 seconds. In the absence of a further factual basis in the record, it is impossible for us to say that it is clear or obvious that Hill was under arrest at that time.

Thus, we have no hesitation in concluding that, on this record, the officers' initial seizure of Hill is properly regarded as a Terry detention. The question then becomes whether it is "clear" or "obvious" (in the absence of factual findings by the district court) that, at the time the officers drew their weapons, they lacked reasonable suspicion to believe Hill was involved in criminal activity.

The Fourth Amendment's requirement of reasonableness is satisfied and a Terry detention is justified if the officer's action is supported by a reasonable articulable suspicion that a person is engaged in, poised to commit, or has committed, a criminal act. United States v. Hensley, 469 U.S. 221, 227 (1985) (stating that a Terry detention is allowed "when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity")(citation omitted); United States v. Sokolow, 490 U.S. 1, 7 (1989); United States v. Cortez, 449 U.S. 411, 417 (1981). This requires more than an "inchoate and unparticularized suspicion or 'hunch.'" Terry v. Ohio, 392 U.S. 1, 27 (1968). The question of reasonable suspicion is determined based on the information the officer(s)

had at the time. <u>United States v. McCoy</u>, 513 F.3d 405, 412 (4th Cir. 2008).

The government argues Hill's detention was supported by reasonable suspicion because at the time the officers knew the following: "a young female had passed them a note that read 'help;' that female was armed with a firearm that was holstered on her left side; that female had just gotten into the car with a man who was seated to her left, well within reach of the firearm; and that . . . female – even though she was armed – needed police intervention, and could not ask for such intervention in a way that the male driver could see." Gov't Br. at 25 (citing J.A. 160, 163-64). Furthermore, the government argues, once the officers were near the car, they were justified in <u>continuing</u> to point their guns at Hill because although "the female immediately complied" with the commands to show their hands, Hill did not. J.A. 161, 165.

Hill argues these facts did not rise to the level of reasonable suspicion because they did not give the police "reason to believe that Hill himself was involved in criminal wrongdoing." Appellant's Br. at 22. "[W]hile these circumstances might be odd," says Hill, they only would have justified "talking to the woman and investigating why the woman thought she needed help." <u>Id.</u> He points to Conaway's testimony, in which Conaway stated that he pulled his gun and began shouting orders

30

because "I couldn't understand why she would need help, being as though she was an armed person, so that kind of, you know, sparked my interest a little bit." J.A. 212 (emphasis added). He explained, "I figured it was -- it might have been something a little bit more than what she could handle at that point." J.A. 213. Because this information was not "specifically about the driver," Hill argues, it does not constitute specific articulable facts that Hill was involved in criminal activity. Appellant's Br. at 23.

Hill, however, did not make this argument in the district court and so the district court made no factual findings as to the existence of reasonable suspicion at the time the officers drew their weapons. We are hard pressed to find that it is "obvious" from the record that the officers lacked reasonable suspicion. Again, there is no surveillance video of Hill's actions inside the car. All we can see (and there is no audio accompanying the surveillance video) is one of the officers (presumably Conaway) walk to the car with his hand on the gun in its holster, un-holster the gun as he approached the car, and then point the gun at the driver as the officer neared the car. The officer then is in an aggressive posture, appears nervous, and clearly is yelling. At some point he discharges his weapon, twice. Especially because we cannot see Hill's actions inside the car, it is impossible to say that it was "clear" from the

31

record that the officers were not justified in drawing their weapons.

If the initial seizure was supported by reasonable suspicion, as we are left to conclude, the question becomes whether the officers were justified in shooting Hill. The parties do not dispute that at the time Hill was shot he was effectively under arrest. See Gov't Br. at 27. Thus, the shooting -- and consequent seizure -- was lawful only if the officers had probable cause that Hill had committed or was committing an offense, and if the manner in which the arrest was carried out was reasonable.

The Fourth Amendment's requirement that a particular seizure be reasonable "depends not only on when it is made, but also on how it is carried out." Graham v. Connor, 490 U.S. 386, 395 (citing Tennessee v. Garner, 471 U.S. 1, 7-8 (1985)). In the context of an arrest (as opposed to an investigatory detention), the reasonableness of "when" an arrest is made depends on whether, under the totality of the circumstances, there were "facts and circumstances within the officer's knowledge [which] would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." United States v. Manbeck, 744 F.2d 360, 376 (4th Cir. 1984). As to the reasonableness of "how" an arrest is carried out, courts "balance the nature and quality of the intrusion on the

32

individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Garner, 471 U.S. at 8.

To determine whether the means by which a particular arrest was effected were reasonable, the Supreme Court has instructed us to pay "careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. "Where the suspect poses no immediate threat to the officer and no threat to others," officers may not use deadly force to apprehend the suspect. Garner, 471 U.S. at 11. But "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." Id.; see also Culosi v. Bullock, 596 F.3d 195, 201 (4th Cir. 2010) (stating the standard as whether there was "sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others"). In any case, however, the reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at

396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Id.

Again, the argument that Hill was unlawfully seized when Conaway shot him is raised for the first time on appeal, and thus we are constrained to review for plain error. Moreover, there is little in the record from which to make our own determination of whether, for example, Hill "pose[d] an immediate threat to the safety of the officer or others."

The government argues there was probable cause to believe Hill posed a threat of serious physical harm to the officers because the officers knew the following:

> a female had just passed him a note that read "help;" that same female was armed with a firearm that was holstered on her left side; that female had just gotten into the car where the sole occupant was a man who was seated to her left, well within reach of the firearm; the female - even though she was armed - needed police intervention, and could not ask for such intervention in a way that the male driver could see; the male driver repeatedly refused the officers' commands to show his hands and exit the vehicle; and the male continually reached to the floor of the vehicle and to his right - the direction of the female's gun - even after being told to exit the vehicle.

Gov't Br. at 30-31. Moreover, the government argues, even assuming "Conaway was mistaken in his belief that Hill posed a

34

threat, his mistake was undoubtedly a reasonable one under the circumstances." Id. at 31. Therefore, the government argues, Conaway was justified in shooting Hill.

Hill argues that when we weigh the three factors enumerated in Graham -- the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight -- it is apparent the officers "did not have an objectively reasonable ground to shoot Hill." Appellant's Br. at 25. As to the severity of the crime, he argues it weighs in his favor because at no point did the officers suspect Hill of having committed a crime; other than knowing that Bennett had written "help" on the receipt and herself carried a gun, all their information came from their observations of Hill inside the car. As to the third factor, he argues, Hill was not actively resisting arrest or attempting to flee.

The reasonableness of the officers' actions thus comes down to whether Hill's movements inside the car rendered reasonable the officers' belief that Hill posed an imminent threat to them, justifying the use of deadly force. The government argues the officers were justified in interpreting Hill's movements as evidence that he was reaching for a gun. Hill argues that belief was unreasonable because "the movement of a suspect's hands,

35

without more, while he is under arrest is insufficient to give rise to an objectively reasonable basis for the police to use deadly force." Appellant's Br. at 26. Only if "the police had seen him with a gun, or had reliable and specific information that he was known to be armed," might this have been a "significant factor," he argues. Id. He also points out that the officers' descriptions of Hill's precise movements were inconsistent, and that it was Bennett, not Hill, whom the officers knew was armed.

Here again, our problem is the absence of adequate information to find that it was "obvious" that Hill did not pose an imminent threat of serious physical harm to the officers. Had Hill raised these issues in the district court, the risk of non-persuasion on these issues would have been cast upon the government to justify a warrantless seizure. See, e.g., United States v. Basinski, 226 F.3d 829, 833 (7th Cir. 2000); United States v. Burke, 605 F. Supp. 2d 688, 693-94 (D. Md. 2009). But under the plain error standard we apply here, Hill must shoulder the burden to prove the contrary. Without findings by the district court on these and related issues, and particularly inasmuch as the surveillance video does not show Hill's

movements in the car, we may not plausibly notice plain error on this record and we decline to do so.[6]

2.

Finally, Hill has argued he is entitled to suppression of the gun because of the false references to murder in the warrant application. Even his arguments related to this point have shifted, however. In his original motion to suppress, he argued that the warrant was limited to searching for evidence of a murder, and there never was a murder; therefore, any search of the car was beyond the scope of the search warrant. He does not press that argument on appeal. And while Hill argued below that the warrant was invalid under Franks, he does not raise a Franks argument on appeal.

The argument on appeal concerning the references to murder relates to the potential applicability of the good-faith exception to the exclusionary rule to justify denial of the

---

[6] The government also argues that even if the shooting was unlawful, a free-standing good-faith exception should apply, because, in summary, excluding the evidence seized from the Buick would not serve as a deterrent against the unreasonable use of deadly force by BPD officers. We note that we have applied the exclusionary rule where the nature and character of a seizure, under the totality of the circumstances, militated in favor of its application. See United States v. Edwards, 666 F.3d 877, 886-87 (4th Cir. 2011); but see id. at 891-92 (Diaz, J., dissenting). In the view we take of this case, we need not and do not consider whether the exclusionary rule is applicable here.

37

motion to suppress the items, including the firearm, seized from the Buick. In other words, Hill argues that, assuming the stop and/or arrest in the parking lot violated the Fourth Amendment, the government cannot rely on the good-faith exception because Leon expressly does not apply when the warrant-issuing judicial officer was "misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." Leon, 468 U.S. at 923 (citing Franks).

This argument is not without some force. Diaz knew the warrant was not being sought to search the car in the course of an investigation of a murder; it was to search the car for a gun that was suspected to be (but in fact was not) in the pocket of the driver, who had just been shot by a police officer. To the extent deadly force was used, it was by the police, not by Hill. Moreover, notwithstanding the outcome below, it would not necessarily have been irrational for a judge taking evidence in a hearing on a motion to suppress in this case to have found that these were not "honest mistakes" that excuse their falsity, as the government argues.[7] Even if Diaz copied and pasted

---

[7] As mentioned previously, Hill did not request a Franks hearing, but under our precedent, he may well have been entitled to one. See United States v. Tate, 524 F.3d 449, 457 (4th Cir. 2008)(holding that defendant was entitled to a Franks hearing where the warrant-issuing judge was not told that some of the
(Continued)

sections of the warrant application from other applications, those errors -- repeated four times in the same application – could be found to be material as well as other than "objectively reasonable."[8]

Nonetheless, because we decline to notice plain error with respect to the seizure arguments, we need not and do not reach the applicability of the good-faith exception to the "murder warrant." And because that aspect of Hill's challenge to the warrant is the only one he has raised on appeal, we do not reach the other questions raised below with respect to the warrant. Accordingly, we discern no reversible error in the district court's denial of the motion to suppress.

## C.

Hill next argues there was insufficient evidence for the jury to find beyond a reasonable doubt that Hill knowingly (if constructively) possessed the firearm that was found in his car. We review the district court's ruling on a motion for judgment

---

evidence included in affidavit on which the judge relied in issuing a warrant might have been obtained in an unconstitutional manner).

[8] Notwithstanding the narrative set out in the body of the affidavit, it takes no imagination to believe a judge reviewing the affidavit in this case might easily conclude, erroneously, that she was being asked to issue a warrant authorizing a search for a murder weapon, and that Hill was the "person of interest" in that murder.

of acquittal de novo and will uphold the verdict if, viewing the evidence in the light most favorable to the government, it is supported by substantial evidence. United States v. Alerre, 430 F.3d 681, 693 (4th Cir. 2005). Substantial evidence is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." Id. (internal quotation marks omitted).

At trial the government sought to prove Hill exercised, or had the power to exercise, dominion and control over the firearm, and thereby constructively possessed it. See United States v. Samad, 754 F.2d 1091, 1096 (4th Cir. 1985). Hill argues the government failed to prove constructive possession because his two to three month ownership of the car was insufficient to support an inference that he had knowing and intentional control over all the personalty in the vehicle and because there was no evidence of a "link between Hill and the firearm – some physical evidence, statement, or conduct that could establish that Hill had a 'stake' in the contraband." Appellant's Br. at 37 (citing United States v. Daley, 107 Fed. App'x. 334, 337 (4th Cir. 2004)). Moreover, he argues,

> the gun could be described as a "paperweight" at best, given its thoroughly rusted and unusable condition. The gun was not lying in the open, but was inside a tied, black stocking. How long that firearm had been sitting around is anybody's guess, and Hill owned the vehicle for a matter of months. The back seat of the vehicle was full of stuff and the only witness who had

40

seen the vehicle before that night testified that many people had access to the car. The inference that Hill knew the firearm was there was simply not a reasonable inference.

Appellant's Br. at 37-38 (citations to record omitted).[9]

The problem with Hill's argument is that the jury concluded otherwise, and there was substantial evidence to support its conclusion. As the government explains and the record read in the light most favorable to the government shows:

Hill was the driver of the vehicle and the firearm was found directly behind the front passenger seat near the center console, which, according to Detective Moran was within the reach of one's right hand when sitting in the driver's seat. Moreover, both officers saw Hill reaching toward the exact area that the firearm was located.

There are several other undisputed facts that indicate Hill was in constructive possession of the firearm. First, he was the registered owner of the car and had been since June 2008. Second, two BGE bills and other financial documents in Hill's name were located in . . . either the glove compartment or the center console of the vehicle. Third, Bennett testified that she had never seen anyone else drive the car.

Gov't Br. at 43-44 (citations to record omitted).[10]

---

[9] Hill's citation to Daley, an unpublished case, is unavailing, because the defendant there was a mere passenger of a car he did not own and had never been in before. Hill, in contrast, owned the vehicle and was the driver.

[10] The government also cites the fact that Bennett believed Hill had a gun in his pocket, but that is irrelevant to the sufficiency of the evidence of constructive possession. At trial the government never argued that the gun actually was in Hill's pocket when he put Bennett's hand there, but once she went into the 7-Eleven he proceeded to take the gun out of his pocket, put
(Continued)

41

Having carefully reviewed the record, we think it is too much of a stretch to argue the jury could not reasonably conclude from the evidence that Hill constructively possessed the gun. The question of whether Hill knew the gun was in the car and exercised dominion and control over it would have depended largely on inferences arising from the credibility of witnesses. Hill does not challenge the jury instructions, and Hill argued in closing argument that he did not constructively possess the weapon. The issues were for the jury, and the district court did not err in denying the motion for judgment of acquittal. United States v. Foster, 507 F.3d 233, 245 (4th Cir. 2007) ("A defendant challenging the sufficiency of the evidence faces a heavy burden.").

D.

Finally, we turn to the sentencing issue. As stated above, Hill challenges the district court's reliance on his April 17, 2007, conviction, pursuant to an Alford plea, to distribution of a controlled substance and possession with intent to distribute a controlled substance. Under the ACCA, if a person convicted under 18 U.S.C. § 922(g)(1) has three previous convictions "for

---

it in a stocking, and wedge it under the seat. Rather, the government's theory was that even though the gun was in the stocking behind the front passenger seat, Hill exercised dominion and control over it.

a violent felony or a serious drug offense," the mandatory minimum term of imprisonment is fifteen years. 18 U.S.C. § 924(e)(1). If a prior drug conviction was under state law, it qualifies as a "serious drug offense" if two elements are satisfied: (1) the offense "involve[ed] manufacturing, distributing, or possessing with intent to manufacture or distribute" and (2) the maximum term of imprisonment for the offense was ten years or more. Id. § 924(e)(2)(A)(ii).

Hill was charged under Md. Code Ann. Crim. Law § 5-602, which makes it unlawful to "distribute or dispense a controlled dangerous substance" or to "possess a controlled dangerous substance in sufficient quantity reasonably to indicate under all circumstances an intent to distribute or dispense a controlled dangerous substance." The penalty for a violation of § 5-602 depends on the substance distributed or possessed with intent to distribute. A violation of § 5-602 "with respect to a Schedule I or Schedule II narcotic drug" is subject to a term of imprisonment "not exceeding 20 years." Id. § 5-608(a). A violation of § 5-602 involving certain other controlled substances carries only a five-year maximum term of imprisonment. Id. § 5-607(a). Because the maximum penalty for a violation of Maryland's drug distribution statute depends on the drug distributed, the parties agree the modified categorical approach applies to determine whether Hill's conviction (1)

43

"involve[ed] manufacturing, distributing, or possessing with intent to manufacture or distribute" and (2) was subject to a maximum term of imprisonment of ten years or more.

At sentencing the government provided certified copies of the indictment charging Hill with distribution of a controlled substance. The indictment alleged in Count One, the count to which Hill tendered his <u>Alford</u> plea, that Hill "did distribute a certain Controlled Dangerous Substance of Schedule # II, to wit: cocaine, which is a narcotic drug, . . . in violation of Criminal Law Article, Section 5-602. . . ." J.A. 698. Count Two charged possession with intent to distribute cocaine; Count Three charged simple possession of cocaine. The government also provided a certified copy of the hand-written docket entry, which noted that Hill pled guilty to Count One. The district court found that these documents satisfied <u>Shepard</u> and established that the 2007 conviction was for distribution of cocaine, thereby satisfying the two elements of a serious drug offense for ACCA purposes.

Hill does not dispute the fact of his conviction, the contents of the indictment, or the fact that the maximum penalty for the charged offense was 20 years. He also does not dispute that he pled guilty (albeit pursuant to an <u>Alford</u> plea) to Count One of the operative indictment, the distribution count. Finally, he has not argued that the government's compilation of

44

documents from the state court fail to comprise "Shepard-approved documents" as we have employed that term in our case law.

Rather, in reliance on United States v. Alston, 611 F.3d 219 (2010), Hill argues the 2007 conviction is not an ACCA predicate because his guilty plea in that case was an Alford plea, and so he did not "confirm the factual basis for the plea." Appellant's Br. at 41. In Alston, the defendant had previously been charged under a Maryland statute that was not categorically an ACCA predicate, and entered an Alford plea to the charge. Although during the plea colloquy the state prosecutor had proffered evidence that Alston pointed a gun at three victims and threatened to kill them, we held the sentencing court could not rely on the prosecutor's proffer because the defendant's Alford plea did not "necessarily rest on facts establishing his participation in a type of assault that qualifies as a violent felony," and "such facts are not inherent in a Maryland conviction for second-degree assault." 611 F.3d at 221. Thus, the transcript of the plea colloquy -- the only relevant Shepard-approved document provided in that case -- was insufficient to support a finding that the defendant pled guilty to an ACCA predicate offense. Id. at 221.

Here, unlike in Alston, the government did not rely on the plea colloquy to "narrow[] the charge to a crime that amounts to

a predicate offense." Id. at 226. Rather, the government relied solely on the indictment and the April 17, 2007, certified docket entry identifying the count to which Hill pled guilty. The indictment and docket sheet are both Shepard-approved documents, as Hill concedes. See Shepard v. United States, 544 U.S. 13, 20-21 (2005). Therefore, the problem in Alston -- that the Alford plea did not conclusively determine that the defendant pled guilty to an ACCA predicate -- is not present here. Rather, the plea establishes the fact of conviction; the Shepard-approved documents establish the "nature" of the offense. Therefore, Hill's circumstances are materially distinguishable from Alston's.

Moreover, in United States v. Washington, 629 F.3d 403, (4th Cir. 2011), the defendant had previously been convicted under the same statute as the one here: Md. Code Ann. Crim. Law § 5-602. As here, the count of the charging document to which Washington had pled guilty charged him with possession with intent to distribute a controlled substance, and specified the alleged substance: "to wit: Cocaine." J.A. 698; Washington, 629 F.3d at 414. This statement in the charging document in Washington, combined with other court records confirming the count to which the defendant had pled guilty, was sufficient to support the district court's finding (by a preponderance) that Washington had "faced a twenty-year maximum sentence that

46

rendered his later plea an ACCA predicate." 629 F.3d at 414.

Although the guilty plea in Washington was not an Alford plea,

that distinction is not material, for the reasons stated above.

Here, Hill pled guilty, and the determination of which count of

the underlying multi-count indictment he pled guilty to was

confirmed by court records other than the transcript of his plea

colloquy. See also United States v. Vinton, 631 F.3d 476, 486

(8th Cir. 2011) (holding that a conviction pursuant to an Alford

plea constituted a crime of violence for Sentencing Guidelines

purposes where the charging document tracked the language of

Missouri's second-degree assault statute, because "[a] precisely

drawn charging document can indicate the basis for conviction

whether or not the conviction was accompanied by an admission of

guilt").[11]

---

[11] There is one theory on which Hill might possibly succeed on his sentencing contention. If Hill could make a plausible argument that he pled guilty to a lesser-included offense in Count One, such as mere possession (rather than distribution) of cocaine, this case would be similar to United States v. Cruz, 2012 WL 836135 (4th Cir. March 14, 2012) (unpublished), which Hill cites in his 28(j) letter.

In Cruz (which of course is non-precedential), the disputed prior offense was a 2002 Oklahoma conviction for assault and battery on a police officer. The criminal information alleged that Cruz "knowingly commit[ted] an assault and battery upon the person of one T.K. Talley[,] a police officer for the City of Tulsa[,] by head butting and contending with him while he was then and there engaged in the performance of his duties as a police officer." Id. at *1. Cruz pled nolo contendere to the charge. Id. We held that the conviction was not an ACCA (Continued)

47

III.

For the reasons set forth, the judgment is

AFFIRMED.

_____

predicate because, for the plea to satisfy Shepard, Cruz would have had to admit the facts charged in the indictment, which he did not, because the plea was nolo contendere. In other words, the court concluded that, even though the information charging Cruz with assault and battery narrowed the charge, through its factual description of the assault, to a crime that would amount to a predicate offense, we were not permitted to "consider the facts alleged in the state information . . . because Oklahoma law does not posit that a defendant who enters a plea of nolo contendere admits such facts." Id. at *5. Put differently, the assault and battery might well have occurred in some other manner, and thus we were constrained to conclude that "it rested on the least serious of the acts encompassed by Oklahoma's assault statute." Id. at *6.

In the case at bar, however, the indictment included a separate count for possession; thus, if Hill had intended to plead guilty to possession (rather than distribution) of cocaine, he would have pled guilty to Count Three, not Count One. Count One of Hill's 2007 indictment charged one and only one offense, distribution of cocaine. Thus, the charging document sufficiently narrowed the charge so that it became a "serious drug offense" and solely a "serious drug offense" under the ACCA.

Moreover, unlike the situation in Cruz, Hill's indictment was entirely devoid of factual allegations that, by virtue of Hill's Alford plea, he did not admit. In short, Hill pleaded guilty to distribution of cocaine, a Schedule II narcotic, and the indictment here provides us no more than the "bare fact of conviction," id. at *2, which, Alford plea or not, we may rely on for purposes of applying ACCA enhancements.