[Cite as *State v. Woodard*, 2016-Ohio-1184.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                          :

        Plaintiff-Appellee,          :            No. 15AP-523
                                                               (C.P.C. No. 14CR-5401)
v.                                            :

                                              (REGULAR CALENDAR)
Matthew A. Woodard,            :

        Defendant-Appellant.        :

---

D E C I S I O N

Rendered on March 22, 2016

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee. **Argued:** *Seth L. Gilbert*.

**On brief:** *Todd W. Barstow*, and *Todd W. Barstow*, for appellant. **Argued:** *Todd W. Barstow*.

---

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Matthew A. Woodard, from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas on appellant's plea of no contest to one count of unlawful possession of a dangerous ordnance following the court's denial of his motion to suppress.

{¶ 2} On October 9, 2014, appellant was indicted on one count of unlawful possession of a dangerous ordnance, in violation of R.C. 2923.17, a felony of the fifth degree. On January 26, 2015, appellant filed a motion to suppress. On February 2, 2015, plaintiff-appellee, state of Ohio, filed a memorandum contra appellant's motion to suppress.

{¶ 3} On February 24, 2015, the trial court conducted a hearing on the motion to suppress. During the hearing, Columbus Police Detectives Robert C. Vass and Carlysle W. Coleman testified on behalf of the state, and appellant testified on his own behalf.

{¶ 4} Detective Vass, a member of the department's criminal investigation unit, gave the following account of the events at issue. On the afternoon of September 30, 2014, Detectives Vass and Coleman were working plain clothes duty in an unmarked vehicle in the vicinity of Weinland Park when they received a police dispatch regarding "a run to the rear of * * * Fourth Street," Columbus. (Tr. 7.) A female had called and "asked for the police to meet her at this location," as she was afraid that her estranged husband "was waiting for her at this location with a gun." (Tr. 8.) The female had "called in and said that she was on her way to her residence * * * to retrieve clothing and personal items, and that she had received threats from her soon to be ex-husband, that he could * * * be there with a firearm and wanting to do her physically bodily harm." (Tr. 7.) According to a police narrative, the "soon to be ex-wife, Marie Jones, called dispatch and stated that her husband threatened to kill her and had texted her a picture of a sawed-off shotgun." (Tr. 24.)

{¶ 5} The female caller provided the dispatcher with a description of her vehicle, "a gold four-door," as well as a "description of the vehicle she believed her soon to be ex-husband would be in." (Tr. 10.) Specifically, she indicated that "the suspect would be in a white Fiat." (Tr. 10.)

{¶ 6} The detectives drove to the residence, and Detective Vass "observed the suspect vehicle and suspect that fit the description that was aired by radio, standing at the rear of her property." (Tr. 10.) The man was "standing at the rear of the Fiat with the hatch open, drinking a beer." (Tr. 11.) The man, "upon seeing * * * the female['s] [vehicle] pull in * * * turned and started to reach in the open hatch of the vehicle." (Tr. 13.) The detectives then identified themselves "as police, told him to drop the beer that he had in his left hand and put his hands up." (Tr. 13.) The suspect, identified at trial as appellant, "turned and looked at us and then went back from looking, he was retrieving something from the trunk." (Tr. 13.) Appellant "ignored our verbal commands to stop what he was doing and put his hands up." (Tr. 13.) Detective Vass then "grabbed the suspect, separated him from the vehicle, knocked the beer out of his hands and started to place him in handcuffs." (Tr. 13.)

{¶ 7}   Detective Coleman "observed a fixed blade knife on [appellant's] waist band," which the detective removed.  (Tr. 13.)  Detective Coleman then stated "33" to his partner, "which is police code for firearm or gun," and at that point Detective Vass "realized there was a firearm or a gun inside that open hatch area."  (Tr. 14.)  The detectives then searched appellant and placed him in a police cruiser.

{¶ 8}   Detective Coleman "reached in and retrieved the sawed-off shotgun." (Tr. 15.)  The detectives discovered "a live round in the firearm when it was recovered." (Tr. 19.)  Detective Coleman "opened the chamber and rendered the weapon safe," and then "placed it back in the trunk."  (Tr. 15.)  Detective Vass deemed the weapon to be "an illegal firearm due to its length.  It had been altered."  (Tr. 17.)

{¶ 9}   Detective Vass testified that appellant did not comply with their orders; rather, he was "ignoring our verbal commands after we identified ourselves as police.  So at that point we wanted to separate him from whatever it was in that trunk until the situation could be de-escalated and made safe."  (Tr. 17.)  Detective Vass stated he was concerned for his safety and the safety of the female.

{¶ 10} Detective Coleman testified regarding his response to the radio dispatch on September 30, 2014 regarding a female "that had concerns for her life.  Apparently her estranged husband had a gun and threatened to shoot and kill her."  (Tr. 38.)  Upon receiving a description of the female's vehicle, as well as the suspect's vehicle, Detectives Coleman and Vass arrived at the address provided and "saw the caller in her car and we saw the suspect in his car."  (Tr. 38.)  The suspect was standing beside a white Fiat with Arizona license plates.  The hatchback of the Fiat was "raised up."  (Tr. 39.)

{¶ 11} The suspect "appeared to be reaching into the car," and as the detectives approached "we could see that * * * he was reaching towards a sawed-off shotgun." (Tr. 39.)  Specifically, as Detective Coleman "looked into the vehicle, right in the area that he was reaching, we observed the sawed-off shotgun with tape around * * * the stock or the handle."  (Tr. 41.)  The weapon was "in plain view," and it was immediately apparent to Detective Coleman that the weapon was a sawed-off shotgun.  (Tr. 41.)

{¶ 12} Appellant gave the following testimony regarding the events at issue. Appellant related that the detectives drove up, "opened the doors and pulled guns on me, told me to put my hands up."  (Tr. 57.)  Appellant stated that he complied with the detectives; he dropped his beer but "turned and dropped my [cell] phone in the trunk."

(Tr. 57.) He denied that the weapon was visible; according to appellant, "if you walked up on my car, you wouldn't have seen it." (Tr. 58.) During direct examination, appellant stated that he "possibly" had threatened his wife. (Tr. 58.) On cross-examination, appellant acknowledged making a motion toward the trunk of his vehicle as the detectives approached. Appellant also acknowledged sending a picture of a firearm to his wife, and "[p]ossibly" sending threatening texts to her on the date of the incident. (Tr. 61.)

{¶ 13} Following the presentation of testimony, the trial court announced from the bench that it was denying appellant's motion to suppress, stating in part:

> * * * [W]e have * * * a police call whereby this woman feels that her life is in danger, and she relays certain facts to the police who, in turn, relay it to these two detectives. These two detectives, acting upon that report as they are certainly entitled to do, go to the location in question and they verify -- and I think that is important to note -- they verify that the lady is there in the * * * gold colored Malibu Chevrolet, and the defendant was in a white Fiat. So they verify the information at the location of where they were supposed to go.
>
> Upon arriving at the scene, they find the defendant standing at the rear of his car with the hatch open. And that's significant because they didn't open the hatch, it was open. And he had apparently had a beer in one hand, although there is some question as to what he may or may not have in the other hand.
>
> The police officers identified themselves as police officers, and I am sure they did that. They told him to put up his hands and drop his beer. Apparently at that point he turned toward the car, perhaps to drop his cell phone, I don't know, at which point Officer Vass apprehended the defendant. In so doing, Officer Vass was clearly in a spot where he was entitled to be. It would be ridiculous to assume that a police officer should ignore these kinds of facts and these kind of reports of weapons.
>
> And when he looks into the car, which is wide open, he sees this incriminating evidence that is incriminating on its face, a sawed-off shotgun. There is neither time nor necessity for him to get a warrant to search the car. He is standing there apprehending the defendant, who apparently has threatened some woman, to kill her, and he is staring at a loaded sawed-off shotgun.

It's ridiculous to assume that he should get a warrant at that point in time. It is in plain view. He is in a location where he has a right to be. It is incriminating on its face and it is a good seizure of the weapon.

So I overrule the motion to suppress * * *.

(Tr. 68-70.)

{¶ 14} Following the hearing, appellant entered a no contest plea to one count of unlawful possession of a dangerous ordnance. By judgment entry filed April 23, 2015, the trial court sentenced appellant to two-years of community control.

{¶ 15} On appeal, appellant sets forth the following assignment of error for this court's review:

THE TRIAL COURT ABUSED ITS DISCRETION IN OVERRULING APPELLANT'S MOTION TO SUPPRESS EVIDENCE.

{¶ 16} Under his single assignment of error, appellant asserts the trial court erred in denying his motion to suppress. Appellant argues the detectives were operating on an uncorroborated and essentially anonymous tip; according to appellant, while the tipster claimed to be his estranged wife, the state failed to introduce evidence as to actual identity. Appellant also maintains that detectives observed no criminal activity upon first contact with him, and they lacked specific and articulable facts to warrant an investigatory stop under the doctrine of *Terry v. Ohio,* 392 U.S. 1 (1968).

{¶ 17} Under Ohio law, "[a]ppellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8, citing *State v. Mills,* 62 Ohio St.3d 357, 366 (1992). Accordingly, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State v. Fanning,* 1 Ohio St.3d 19, 20 (1982). Further, "accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara,* 124 Ohio App.3d 706, 707 (4th Dist.1997).

{¶ 18} In *Terry*, the United States Supreme Court held that a police officer "can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause" to make an arrest. *United States v. Sokolow,* 490 U.S. 1, 7 (1989), quoting *Terry* at 30. In order to justify a brief investigatory stop, the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry* at 21. Further, "[t]he propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances." *State v. Freeman,* 64 Ohio St.2d 291 (1980), paragraph one of the syllabus. A court will "evaluate those circumstances 'through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.' " *State v. Koueviakoe,* 4th Dist. No. 04CA11, 2005-Ohio-852, ¶ 19, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87 (1991).

{¶ 19} Courts have, in general, recognized "three categories of informants: (1) citizen informants; (2) known informants (a criminal who has previously provided reliable tips); and (3) the identified citizen informant." *State v. Kerns,* 4th Dist. No. 15CA6, 2016-Ohio-63, ¶ 21, citing *Maumee v. Weisner,* 87 Ohio St.3d 295, 300 (1999). With respect to these categories, "[i]dentified citizen informants are typically considered highly reliable while anonymous tipsters require corroboration as they may be unreliable." *State v. Hicks,* 7th Dist. No. 14 CO 10, 2015-Ohio-1324, ¶ 10.

{¶ 20} In *Hicks* at ¶ 11, the court discussed the reliability of informants' tips as related to the issue of reasonable suspicion, holding in part:

> An informant's veracity, reliability, and basis of knowledge are highly relevant in evaluating the informant's tip. However, an "anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity" to justify an investigative stop. If the informant's facts are "sufficiently corroborated to furnish reasonable suspicion that [the defendant] was engaged in criminal activity," then a stop is lawful. When an officer can point to "specific, articulable facts" along with any rational inferences that warrant an investigation, reasonable suspicion exists.

(Citations omitted.)

{¶ 21} The United States Supreme Court has recognized that "even an anonymous tip, when corroborated by independent police work, may have sufficient indicia of reliability to provide reasonable suspicion for an investigatory stop." *Koueviakoe* at ¶ 24, citing *Alabama v. White,* 496 U.S. 325, 332 (1990). *See also Hicks* at ¶ 12 (A tip that, "standing alone, would lack sufficient indicia of reliability may establish reasonable suspicion if it is sufficiently corroborated through independent police work.").

{¶ 22} In response to appellant's argument regarding the nature of the tip in the instant case, the state maintains the record is not entirely clear that the tip was anonymous. More specifically, the state argues that the investigative report identifies the caller as Marie Jones; further, the state maintains, while neither the report nor other evidence in the record discloses whether Jones identified herself during the call, the evidence is undisputed that the caller provided sufficient identifying information such that the tipster should not be treated as anonymous.

{¶ 23} As recognized by one federal court, the "view that tips fall into two stark categories that are wholly anonymous or wholly non-anonymous is inconsistent both with reality and with Fourth Amendment law" because, "in reality, tips fall somewhere on a spectrum of reliability." *United States v. Perkins,* 363 F.3d 317, 324 (4th Cir.2004). Further, the fact that a tip may be anonymous does not mean that a court, in assessing the tip's reliability, must "then ignore salient facts such as an officer's reasonable and informed judgments as to the identity of a caller." *Id.*

{¶ 24} Even in situations in which a caller does not provide his or her name, courts have found a tip is not truly anonymous where the caller provides sufficient identifying information, such as his or her address, so that identity can be verified. *See, e.g., United States v. Huebner,* E.D.Tenn. No. 3:11-CR-123 (Feb. 13, 2012) (caller was "not anonymous as she gave her address for the officers to be able to question her further," and she confirmed what she reported to dispatcher when she spoke with officer); *United States v. Jimenez,* 537 Fed.Appx. 678, 680 (9th Cir.2013) ("the reporting party was not 'anonymous' in the sense that it would have been impossible to discover his identity [as] he gave the dispatcher both the name and street address of his apartment complex").

{¶ 25} Upon consideration of the totality of the circumstances present in this case, we reject appellant's contention the detectives lacked reasonable suspicion to conduct an investigatory stop. The record indicates that the caller provided the dispatcher her

address, described the vehicle she was driving, revealed that she was driving to the residence located at the address provided, and requested that police personnel meet her at that location. As noted, a significant indicator that an anonymous informant is reliable "is her disclosure of information that would enable authorities to identify her if they deem it necessary to do so." *State v. Elston,* 479 F.3d 314, 318 (4th Cir.2007), citing *United States v. Quarles,* 330 F.3d 650, 656 (4th Cir.2003) (caller provided enough information for the police to track him down and enough that caller "is bound to have felt as though he was being held accountable for what he was saying").

{¶ 26} The caller here also provided detailed information with respect to appellant, including the make and color of the vehicle he would be driving, and the caller's belief that her estranged "soon to be ex-husband" would be waiting at the address. Courts have held that such "predictive information" enhances an anonymous caller's credibility. *United States v. Perminter*, W.D.Pa. No. 10-204 (Jan. 30, 2012), quoting *United States v. Ritter,* 416 F.3d 256, 272 (3d Cir.2005) (noting that "[c]ourts have recognized that anonymous tips which contain predictive information about the accused's future actions and are verified by law enforcement are most helpful to bolster 'the veracity and reliability of the tip' ").

{¶ 27} The record supports the trial court's determination that the police detectives, upon arriving at the address provided, were able to corroborate a substantial amount of the information provided by the caller. Specifically, the detectives observed appellant standing beside a white Fiat and they also observed the caller's "gold, four-door" vehicle arrive at the address. As the gold-colored vehicle drove by, the detectives observed appellant reach into the open trunk of the Fiat.

{¶ 28} The need to further investigate was heightened by the fact the caller reported possible criminal activity, i.e., that appellant had sent the caller threatening texts, including a picture of a sawed-off shotgun, and that he could be waiting there "with a firearm and wanting to do her * * * bodily harm." *See Elston* at 319 (caller's report of imminent threat to public carried "substantial weight in assessing the reasonableness" of the officers' actions). During the suppression hearing, appellant acknowledged sending his estranged wife a picture of a firearm and he admitted to "possibly" threatening her. Further, there was testimony that appellant failed to comply with the commands of the

detectives after they identified themselves as law enforcement officers. As the detectives approached, they observed a sawed-off shotgun in the trunk.

{¶ 29} Upon review, the information provided by the caller, as well as the facts corroborated by the detectives, provided a sufficient basis for the detectives to reasonably conclude that criminal activity might be afoot. Thus, even accepting appellant's premise that the caller was anonymous, we find, based on the totality of the circumstances, there existed "sufficient indicia of reliability" to provide the detectives reasonable suspicion to conduct an investigatory stop. *Koueviakoe* at ¶ 24.

{¶ 30} The record also supports the trial court's determination that the detectives were lawfully in a position to view the already opened trunk, and the shotgun was in the detectives' plain view as they approached the scene and observed appellant reaching toward the trunk. One of the detectives testified that he immediately knew, upon observing the shotgun, that it had been altered (i.e., sawed-off) and was illegal. Under these circumstances, the trial court properly concluded that the seizure of the weapon was authorized by the plain-view doctrine. *See Minnesota v. Dickenson,* 508 U.S. 366, 375 (1993) (under plain-view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant").

{¶ 31} Based on the foregoing, the trial court did not err in denying the motion to suppress. Accordingly, appellant's single assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

DORRIAN, P.J., and TYACK, J., concur.

_____