COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys,[*] Beales and Lorish
Argued by videoconference

**PUBLISHED**

MARKEES GROSS, SOMETIMES KNOWN AS
 MARKEES A. GROSS

v.     Record No. 1043-22-2

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE RANDOLPH A. BEALES
JANUARY 23, 2024

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
W. Reilly Marchant, Judge

Catherine French Zagurskie, Chief Appellate Counsel (Virginia
Indigent Defense Commission, on briefs), for appellant.

Jason D. Reed, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.

Following the Circuit Court of the City of Richmond's denial of his motion to suppress,

Markees Gross entered a conditional plea of no contest to one count of possession of a firearm

by a non-violent felon. On appeal, Gross argues, "The trial court erred by denying the motion to

suppress where law enforcement did not have the requisite reasonable, articulable suspicion to

justify a protective sweep of the vehicle."

I. BACKGROUND

"Under familiar principles of appellate review, we will state 'the evidence in the light

most favorable to the Commonwealth, [as] the prevailing party in the trial court, and will accord

the Commonwealth the benefit of all reasonable inferences fairly deducible from that evidence.'"

---

[*] Judge Humphreys participated in the hearing and decision of this case prior to the
effective date of his retirement on December 31, 2023.

*Sidney v. Commonwealth*, 280 Va. 517, 520 (2010) (quoting *Murphy v. Commonwealth*, 264 Va. 568, 570 (2002)).

At about 1:30 a.m. or 1:45 a.m. on November 1, 2021, City of Richmond Police Officers John Gilbert and Michael Triana were driving their patrol car toward the intersection of Dove Street and the Richmond-Henrico Turnpike. Officer Triana testified, "It's a high crime area. Shootings, guns, violence in that same intersection of Richmond-Henrico and Dove where I have . . . heard gunfire, myself." He went on to state that, as the officers were approaching the intersection, they saw that a "white vehicle was traveling at a high rate of speed and disregarded the stop sign completely." Officer Gilbert testified that the white vehicle was going "well over 40 miles an hour" and that the posted speed limit is 25 miles an hour.

The officers turned on their patrol car's flashing lights and siren to initiate a traffic stop after they saw the white vehicle speed through the stop sign at the intersection. Officer Gilbert testified that the officers followed the white vehicle for "approximately four blocks or so" before the white vehicle eventually pulled over onto the side of the road. Officer Gilbert testified, "There's multiple side streets that someone would be able to pull off around there." He also stated that he did not believe that Gross was fleeing, but Officer Triana testified that the distance the vehicle traveled before coming to a stop was "[m]ore than I was comfortable with." After following the white vehicle for those four blocks until it stopped, Officer Triana then stopped the patrol car behind the white vehicle. Officer Gilbert testified that the officers had trouble seeing inside of the vehicle because the windows had a dark tint. Before the officers exited their patrol car, Officer Triana turned on the patrol car's "take-down lights" to help them see through the vehicle's heavily tinted windows.

The officers then exited their patrol car to approach the white vehicle, with Officer Gilbert walking toward the passenger's side and Officer Triana walking toward the driver's side.

- 2 -

As the officers approached the vehicle, they could see that the driver was the only person inside the vehicle. Officer Gilbert could also "see the driver, Mr. Gross, um, reaching to the left of the driver seats." Officer Gilbert testified, "His [Gross's] whole body contorted to the left, and then I could not see either one of his hands. It appeared that he was, um, potentially reaching down to the side." Officer Triana testified:

> When I got to a close enough distance while I was able to look inside the vehicle, I saw Mr. Gross twisted towards the back seat, like he was reaching for something. I saw his arms move towards the passenger side. At one point during the stop, I saw his arms go towards the driver's side panel of the vehicle. And at that point, we approached the vehicle. And told him it was a police stop.

Officer Gilbert also testified, "We asked if there were firearms; he [Gross] said, no." Officer Gilbert then asked Gross to step out of the vehicle, and he testified that Gross "appeared very nervous" as he was moving toward the rear of the vehicle. The officers placed Gross in handcuffs, and Officer Gilbert conducted a pat-down search of Gross. Officer Gilbert then told Gross that he was going to conduct a protective sweep of the vehicle, and Officer Gilbert testified that Gross stated that "it was his girlfriend or wife's vehicle, but he [Gross] doesn't know if there's any firearms or sort within the car."[1] Officer Gilbert then searched inside the vehicle in "[t]he immediate area that he [Gross] would potentially be able to reach." While searching the glove box on the passenger side of the vehicle, Officer Gilbert "recovered a Taurus firearm that was loaded with one in the chamber."

Gross, who is a convicted felon, was charged with possession of a firearm by a convicted felon. Gross moved to suppress the evidence of the firearm found inside the vehicle. At the hearing on the motion to suppress, after hearing the testimony of Officers Gilbert and Triana, the trial court found that Gross "went four blocks" after the officers turned on the patrol car's lights

---

[1] The Commonwealth does not argue that Gross lacks standing to challenge the protective sweep.

and siren to initiate the traffic stop at "1:45 in the morning in a high crime area." The trial judge stated, "And let's also keep in mind that this person is alleged to have gone 40 miles an hour through a stop sign, it may not be too difficult to figure out why a police officer is now behind him. But be that as it may, he failed to stop." When comparing cases that Gross relied on in his motion to suppress, the trial judge stated, "In the Correll case, the alleged furtive movements were before the police presence was known. But in our case, they were after."[2] Finally, the trial judge noted, "And you've got officer safety, possibly lives on the line. The protective search is not done, and a person reaches and then grabs a gun, you've got two dead police officers or one dead police officer and a dead defendant." The trial court denied Gross's motion to suppress, and Gross then entered a conditional plea of no contest. Gross now appeals the denial of his motion to suppress.

## II. ANALYSIS

In his assignment of error on appeal, Gross argues, "The trial court erred by denying the motion to suppress where law enforcement did not have the requisite reasonable, articulable suspicion to justify a protective sweep of the vehicle." The Supreme Court has often stated that "[t]he defendant has the burden to show that, when viewing the evidence in the light most favorable to the Commonwealth, the trial court's denial of the motion to suppress was reversible error." *Sidney*, 280 Va. at 522. "We review de novo the trial court's application of the law to the particular facts of the case." *Branham v. Commonwealth*, 283 Va. 273, 279 (2012). Furthermore, this Court is "bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." *McGee v.*

---

[2] *Commonwealth v. Correll*, No. 2287-14-1 (Va. Ct. App. May 26, 2015), is an unpublished memorandum opinion which came as a Commonwealth's appeal to this Court. Rule 5A:1(f) states that unpublished memorandum opinions "will not be received as binding authority."

*Commonwealth*, 25 Va. App. 193, 198 (1997) (*en banc*) (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).

It is well established that "[a]n officer may effect a traffic stop when he has reasonable suspicion to believe a traffic or equipment violation has occurred." *McCain v. Commonwealth*, 275 Va. 546, 553 (2008). After a police officer pulls over a vehicle for a traffic stop, "the Fourth Amendment permits police to conduct a pat down of a person and a protective sweep of his or her vehicle for weapons under certain circumstances." *Bagley v. Commonwealth*, 73 Va. App. 1, 13 (2021) (citing *Terry v. Ohio*, 392 U.S. 1, 27, 30-31 (1968)). The Supreme Court of the United States has held:

> [T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

*Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (quoting *Terry*, 392 U.S. at 21). The United States Supreme Court has also emphasized that "[t]he sole justification of the search in the present situation is the protection of the police officer and others nearby . . . ." *Terry*, 392 U.S. at 29. In addition, this Court has recognized that "police may conduct a protective sweep of the vehicle based on the assumption that when the stop concludes, the individual presumably 'will be permitted to reenter his automobile' and 'will then have access to any weapons inside.'" *Bagley*, 73 Va. App. at 15 (quoting *Long*, 463 U.S. at 1052). As the United States Court of Appeals for the Fourth Circuit has held, "Such a protective search is authorized even if the suspect is under police restraint at the time the search is conducted, because the suspect may be able to escape such restraint, or may later regain access to the vehicle if he is not arrested." *United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007). "The standard requires proof of only

a reasonable belief that the suspect *might* have a weapon and gain control of it." *Bagley*, 73 Va. App. at 16. Both the Supreme Court of Virginia and the Supreme Court of the United States have noted that "reasonable suspicion is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less demanding than that for probable cause.'" *Perry v. Commonwealth*, 280 Va. 572, 581 (2010) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

To determine whether the officers had reasonable suspicion to conduct a protective sweep of Gross's vehicle, "we must consider 'the totality of the circumstances—the whole picture.'" *Sokolow*, 490 U.S. at 8 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). "Circumstances relevant in this analysis include characteristics of the area surrounding the stop, the time of the stop, the specific conduct of the suspect individual, the character of the offense under suspicion, and the unique perspective of a police officer trained and experienced in the detection of crime." *McCain*, 275 Va. at 554. The Supreme Court of the United States has stated that this analysis "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Cortez*, 449 U.S. at 418).

The facts of this case are similar to the situation that was before the Supreme Court of Virginia in *Hill v. Commonwealth*, 297 Va. 804 (2019), where the Supreme Court affirmed the trial court's determination that two narcotics detectives had reasonable suspicion to believe that Hill was reaching for a weapon to use against them. In *Hill*, the two detectives were patrolling "a high-crime, high-drug area" when they saw Hill sitting alone in his parked car. *Id.* at 816. The detectives did not witness Hill commit any crime in front of them, but they did see that Hill "started digging frantically between the driver's and passenger's seats" *after* he noticed that the

detectives were walking toward his vehicle. *Id.* Hill then disregarded the detectives' commands "to show his hands." *Id.* The Supreme Court reasoned that these circumstances gave the detectives reasonable suspicion to believe that Hill "was quite possibly in the very act of *reaching for a weapon* at the very moment that the detectives were plainly expressing their concern that he might be doing so." *Id.* at 822.

Here, before the traffic stop had even begun, Officers Gilbert and Triana witnessed Gross drive his vehicle over the speed limit at "40 miles an hour through a stop sign" at "1:45 in the morning in a high crime area," where shootings and other violent crimes are known to take place. After Gross blew right through the stop sign of an intersection, the officers turned on their patrol car's lights and siren to initiate the traffic stop. However, Gross then "failed to stop" for four blocks (passing at least one side street) before he eventually came to a stop on the side of the road. While one of the officers said that he did not believe that Gross was trying to flee, the other officer said that the distance Gross traveled was "[m]ore than I was comfortable with." When Gross finally pulled over, the officers had to turn on the patrol car's bright "take-down lights" in order to even see through the dark tint of Gross's windows. As the officers approached Gross's vehicle, they saw that he "twisted towards the back seat, like he was reaching for something." Officer Gilbert stated that Gross's "whole body contorted to the left" as he was "reaching to the left of the driver seats." Similar to *Hill*, the officers here watched Gross frantically move his body around the vehicle and reach his hands out of the officers' sight *after* Gross had stopped his vehicle and after the two officers had gotten out of their vehicle and were walking toward him. *See Hill*, 297 Va. at 816.

Given the totality of the circumstances in this case and given the Supreme Court's decision in *Hill v. Commonwealth*, we hold that Officers Gilbert and Triana certainly had reasonable articulable suspicion to justify a protective sweep of Gross's vehicle during the traffic

stop. The officers observed Gross speed through a stop sign in an area known for violent crimes involving guns. Gross's delay in pulling over by driving on for four blocks after the police had turned on their siren and flashing lights gave the officers reasonable concern that he might be reaching for and preparing to use a weapon against them during the traffic stop. There are, of course, many non-nefarious reasons a vehicle may delay in pulling over, such as finding a safe place to do so. However, the trial court properly considered the length of the delay, the location of the stop, and whether Gross had opportunities to pull over sooner, and we cannot say that the trial court was plainly wrong or without credible evidence to find that Gross was not merely finding a safe place to stop, but rather had affirmatively failed to stop when he should have. Furthermore, once Gross saw that the officers were actually walking toward his vehicle, he made a series of movements within the vehicle (moving his hands out of the officers' view) that gave Officers Gilbert and Triana further reason to believe that Gross could well be searching for and reaching for a weapon. Consequently, based on the totality of the circumstances before us in this case, with each individual fact mounting upon the others, Officers Gilbert and Triana certainly had reasonable articulable suspicion to believe that Gross was armed and dangerous during the traffic stop – and thus that they could do a protective sweep of Gross's vehicle for officer safety. Therefore, we cannot say that the trial court erred when it denied Gross's motion to suppress.

## III. CONCLUSION

For all of these reasons, we do not disturb the judgment of the trial court and affirm Gross's conviction.

*Affirmed.*